Nancy EBKER, Plaintiff,

v.

TAN JAY INTERNATIONAL LTD. and
Peter Nygard, Defendants.

No. 78 Civ. 0905 (IBC).

United States District Court,
S.D. New York.

July 5, 1990.

Freedman & Spector, Rockville Centre, N.Y., for plaintiff (Sol Freedman, of counsel).

Jacobson & Triggs, New York City, for defendants (John F. Triggs, of counsel).

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiff Nancy Ebker ("Ebker"), a designer and merchandiser of women's apparel, commenced this action against defendants Peter J. Nygard ("Nygard") and Tan Jay International Ltd. ("Tan Jay"), alleging that defendants wrongfully repudiated an oral joint venture agreement entered into between Ebker and Nygard. Tan Jay is a corporation involved in the manufacture of women's sportswear, and Nygard is its chief executive officer and principal shareholder.

Plaintiff asserts that Nygard and Tan Jay breached and repudiated the oral joint venture agreement by, *inter alia*, firing and excluding Ebker from the newly formed venture and preventing her from performing her duties thereunder; announcing to the suppliers of the venture and others that Ebker was not authorized to make contracts and commitments on behalf of the venture and refusing to continue to supply the funds required for the operation of the venture; giving notice that the employment of key personnel, constituting Ebker's management team, was being terminated, and actively soliciting and seeking to transfer the loyalty of others to Tan Jay; and continuing to use Ebker's designs, name and likeness in connection with the sale of Tan Jay's merchandise without her approval.[1]

Plaintiff seeks an accounting from defendants for their alleged wrongful acts, and the imposition of punitive damages.

Defendants deny the allegations of the complaint. Tan Jay asserts a counterclaim against Ebker, alleging that she wrongfully interfered with Tan Jay's business operations, thus causing it to miss crucial shipping dates, and is therefore liable to it for conversion, breach of bailment contract, tortious interference with contract, and tortious interference with prospective advantage. Additionally, Tan Jay seeks the imposition of punitive damages against Ebker.

## PRIOR PROCEEDINGS

A remarkable procedural history accompanies this twelve-year-old-action. Ebker filed suit on March 1, 1978. A jury trial

---

1. The second and third counts of plaintiff's complaint, alleging fraudulent inducement of contract and violation of privacy rights, respectively, were withdrawn upon consent of counsel. (Joint Pre–Trial Order, dated November 24, 1986, para. 4.)

was held before the Honorable Mary Johnson Lowe in October, 1981. Judge Lowe strictly limited the trial to the resolution of two questions: (1) whether Ebker had entered into a joint venture partnership agreement with Nygard and/or (2) whether Ebker had entered into a joint venture partnership agreement with Tan Jay. The counterclaim of defendant Tan Jay was severed from the main action for trial at a later date. The jury found that Ebker had entered into a joint venture partnership agreement with Nygard, but had not entered into such an agreement with Tan Jay. Judge Lowe set aside the finding of the jury that Ebker and Nygard had entered into a joint venture and entered judgment in favor of Nygard.

Two years later, in October, 1983, trial of the counterclaim was held. Judge Lowe instructed the jury that "[S]ince the jury found that there was no joint venture relationship between Nancy Ebker and Tan Jay, the only relationship that can be asserted now *vis-a-vis* the counterclaim is that of employer, being Tan Jay, and employee, being Ebker." *Ebker v. Tan Jay International, Ltd.*, 739 F.2d 812, 821 (2d Cir.1984). The jury, governed by Judge Lowe's instruction that Ebker was an employee of Tan Jay, awarded Tan Jay $322,-718 in compensatory damages.

Plaintiff appealed from both the entry of judgment notwithstanding the verdict in the first trial and the award of damages in the second trial. Tan Jay cross-appealed solely on the issue of Judge Lowe's refusal to instruct the jury as to punitive damages against Ebker. Our Circuit Court, in an opinion by the late Judge Friendly, held that Judge Lowe erroneously granted j.n.o.v. in favor of defendant Nygard. The Court directed that the case be remanded to the district court and the verdict in favor of Ebker in the first trial be reinstated, with appropriate further proceedings to be conducted with respect to what remedies Ebker might have. The Court of Appeals vacated the judgment entered in Tan Jay's favor on its counterclaim, in light of the fact that the trial had proceeded on the assumption that Ebker was an employee of Tan Jay, and not a joint venturer with Nygard, and remanded the counterclaim to the district court for a new trial on an assumption more favorable to Ebker. Tan Jay's cross appeal was dismissed without prejudice.

This action was reassigned to us on March 3, 1986. Trial to the Court was held on September 14–18, and concluded on October 6, 1987. At the conclusion of plaintiff's case, defendants moved for a directed verdict, which motion was subsequently denied. At the close of trial both plaintiff and defendants moved for directed verdicts and plaintiff moved to dismiss Tan Jay's counterclaim. We reserved decision on these motions.

Subsequently, on January 27, 1988, plaintiff moved to reopen the trial record to admit certain documentary and testimonial evidence which plaintiff had attempted to introduce at trial.[2] On September 1, 1988 we granted plaintiff's motion, and held a hearing on October 12, 1988, strictly limited to evidence and testimony with respect to the March 3, 1978 conference before Judge Ascione. Defendants objected to any of the evidence or testimony introduced at the hearing becoming a part of the trial record; we reserved decision on this motion.

The parties submitted all post-trial and post-hearing papers by the end of March, 1989. We base our holding on the findings of fact and conclusions of law hereinbelow.

## FINDINGS OF FACT

Plaintiff was born on December 7, 1938 (Tr. 8)[3] and in 1959 she received a degree

---

**2.** Plaintiff attempted to introduce evidence relating to a conference held on March 3, 1978 before the Honorable Alfred M. Ascione of the Supreme Court of the State of New York. Defendants objected to the introduction of such evidence. At the Court's suggestion, the parties agreed to enter into a stipulation with respect to what transpired at the conference. We were subsequently advised that the parties were unable to enter into an acceptable stipulation, and thus plaintiff moved to reopen the trial record to present the excluded evidence.

**3.** The letters "Tr." followed by a number indicate pages of the official trial transcript.

in fashion design from the Parsons School of Design. (Tr. 9) Following her graduation she was employed by various organizations as a designer (Tr. 9–11); in 1964 she accepted a position with the Jonathan Logan Corporation, the largest manufacturer of women's apparel in the United States at that time. (Tr. 15) Ebker's title was vice-president of merchandising and design of the company's newly founded women's sportswear division which was entitled "Act III" (Tr. 16). Ebker's duties for "Act III" included, *inter alia,* the design, development, and merchandising of the "Act III" line of apparel. When Ebker commenced her employment with the Jonathan Logan Corporation the sales of the newly founded "Act III" were zero; and when she terminated her employment in 1976, "Act III" had achieved $80,000,000 in gross sales. (Tr. 21) Ebker's name was prominently displayed in all Act III advertising, and was in effect synonymous with the "Act III" line. (Tr. 22, Ex. 1)

In 1976 Ebker accepted a position with Genesco, Inc. ("Genesco"), a corporation consisting of more than eighty-eight divisions. (Tr. 27) Genesco hired Ebker to head its floundering "Susan Thomas" division, which consisted of two lines of women's apparel, the "Susan Thomas" line and the "Vivo" line. (Tr. 35) Ebker was appointed President of the "Susan Thomas" division and was given complete control over the design, merchandising, marketing and production of the two lines. (Ex. 2; Tr. 38) Ebker was the only woman president of a major apparel division at that time. (Tr. 38) Her employment contract with Genesco provided that she was to receive a salary of $125,000 as well as a guaranteed bonus of $25,000. (Ex. 2) The contract further provided that in the event it was terminated at any time by Genesco, without cause, Genesco would continue to pay Ebker compensation at a minimum rate of $152,500 per year until July 31, 1979, or until she accepted other employment, whichever occurred earlier; that if Ebker accepted employment with another employer prior to July 31, 1979, her compensation from Genesco would be reduced only to the extent of her earnings from her new em-

ployer; and that discontinuance by Genesco of the division would be construed as a termination without cause of Ebker's employment, entitling her to all of the termination rights and benefits. (Ex. 2; Complaint para. 6)

Ebker commenced her employment with Genesco on September 23, 1976 (Tr. 41) and immediately realized that the "Susan Thomas" division had been grossly mismanaged and was at that time generating only $4,000,000 in gross sales. (Tr. 41) Ebker decided to replace the ailing "Susan Thomas" apparel line with a new line entitled "Sportwork–Nancy Ebker," and to upgrade the "Vivo" line. (Tr. 51)

Within one year after Ebker's arrival at Genesco the "Vivo" line was generating over $9,000,000 in gross sales, which was three times more than it had been generating when she first joined Genesco. (Tr. 62) The "Sportwork–Nancy Ebker" line also achieved great success under Ebker's management; within a four month period it generated over $1,300,000 in sales. (Tr. 63) Ebker received numerous letters and telegrams from executives at Genesco and other persons in the fashion industry congratulating her on her success with the "Susan Thomas" division. (Ex. 5; Tr. 64)

In August, 1977, Ebker was advised by officers at Genesco that it wished to divest itself of all of its unprofitable apparel divisions. (Tr. 68–69; Ex. 10) At that time the "Susan Thomas" division, although performing extremely well under Ebker's direction, was approximately $700,000 away from being a profitable division. (Tr. 69; 80) Ebker was afforded the opportunity to purchase the assets of the "Susan Thomas" Division in order that the "Vivo" and "Sportwork–Nancy Ebker" lines could continue. Genesco listed the value of these assets on its books as approximately $1,000,000. (Tr. 74–75) Genesco was particularly concerned with the continued production of these two lines of apparel because of the existence of a licensing contract with the Marbrooke Corporation ("Marbrooke"), a Canadian corporation, which agreement gave Marbrooke the right to use the trademarks "Sportwork–Nancy

Ebker" and "Vivo" in Canada. (Ex. 7) Genesco wanted Ebker to continue with the "Sportwork–Nancy Ebker" and "Vivo" lines in order that it would not be in breach of its licensing agreement with Marbrooke. As a result, Ebker's purchase of the assets of the "Susan Thomas" division was conditioned upon her assumption of the Marbrooke licensing agreement. (Tr. 78)

Ebker did not have the financial means to acquire the assets of the "Susan Thomas" division from Genesco (Tr. 80); accordingly, she sought potential backers for their acquisition; Ebker testified that approximately $700,000 was needed to fund the "Sportwork–Nancy Ebker" and "Vivo" lines until they would show a profit. (Tr. 80) She negotiated with both Morsley, Inc., and the Lynn Wear Corporation. Neither corporation was interested in acquiring the "Vivo" line (Tr. 80–81), which was burdened with union contracts. (Tr. 82) Ebker was particularly interested in continuing with the revamped "Vivo" line because she and her staff had expended considerable time and energy in revitalizing it. (Tr. 90–91)

On November 17, 1977, Genesco ceased selling the "Sportwork–Nancy Ebker" and "Vivo" lines of apparel. (Tr. 330) That same day, Ebker decided to accept the offer of a fifty/fifty partnership with Lynn Wear on the "Sportwork–Nancy Ebker" line of apparel, despite its refusal to continue with the "Vivo" line. (Tr. 85) Later that day, Ebker was contacted by the merchandise manager at Macy's, who asked her to meet with Nygard. Ebker had never heard of Nygard or his Canadian company, Tan Jay. (Tr. 86)

That afternoon, Ebker and Nygard met at Ebker's office, located at 1411 Broadway in New York City. (Tr. 88) Ebker informed Nygard that she had already decided to accept a partnership offer with another corporation. (Tr. 88) Nygard inquired whether Ebker would be interested in ne-

gotiating with him if he could continue the "Vivo" line, and Ebker answered in the affirmative. (Tr. 90–91) They met the following day and continued negotiations; Nygard informed Ebker that the "Vivo" line could be manufactured in California under a new name, thus obviating the necessity of honoring the union contracts that burdened the "Vivo" line. (Tr. 95) Ebker expressed her concern about using non-union employees to manufacture "Vivo", fearing the quality of the line would suffer. (Tr. 96) Nygard assured Ebker that he would "bring his people down from Canada" and work only with high quality California factories to manufacture the "Vivo" line. (Tr. 96)

During the course of their negotiations, Ebker explained the Marbrooke licensing arrangement to Nygard, and advised him that it was a condition precedent to obtaining the assets of the "Susan Thomas" division. (Tr. 98) Ebker also testified that Nygard understood that she would not consider any arrangement other than a fifty/fifty partnership, that she would continue to run the company in the same manner as she had while employed at Genesco, and that her management team would remain intact. (Tr 101) Ebker testified that Nygard agreed to all of her conditions and advised her that he would be strictly "absentee management." (Tr. 101)[4] In addition, Ebker and Nygard agreed that both she and Nygard would receive an annual salary of $40,000 plus a $10,000 bonus, based on profits. (Joint Pre–Trial Order, dated November 24, 1986, uncontested fact 18(a); Tr. 119).

On November 25, 1977 Nygard and Ebker met again in London and continued their negotiations. (Tr. 106) Ebker showed Nygard the five year projections for the "Vivo" and "Sportwork–Nancy Ebker" lines, which had been prepared by Ebker with the assistance of an accounting firm. The projections indicated that "Vivo"

---

4. At the first trial of this matter, held in October, 1981, Nygard denied that a partnership was discussed. However, the jury accepted the testimony of Ebker on this point, and this finding was later affirmed by our Circuit Court. *See Ebker v. Tan Jay Inter., Ltd.,* 739 F.2d 812 (2d

Cir.1984). At the trial before us, no testimony was offered by defendants as to what the terms of the partnership would be; the only testimony addressed to the terms of the arrangement between Nygard and Ebker was that of Ebker.

would generate $65,000,000–$70,000,000 of gross sales in five years, and "Sportwork–Nancy Ebker" would generate $40,000,000 in the same time period. (Tr. 109) Nygard advised Ebker that the projections were conservative. (Tr. 109–110)

In addition to their discussions with respect to five year projections for the two lines, Ebker testified that the following items were discussed: Nygard would fund the newly formed partnership until the "break-even" point, which it was estimated would occur in approximately nine months; Ebker testified that approximately $700,-000 was necessary to fund the venture until it realized a profit (Tr. 139). The "Sportwork–Nancy Ebker" line would henceforth be known as simply "Nancy Ebker" and the "Vivo" line would be renamed "Bianca," the same name as a line of clothing that Tan Jay was currently manufacturing in Canada. (Tr. 117, 141)

Following Ebker's and Nygard's return from London, Ebker arranged for Nygard to meet with Everett Warren, Director of Operations at Genesco; both Ebker and Nygard were present at the meeting. (Tr. 147) Warren told Nygard that assumption of the Marbrooke contract was part and parcel of the acquisition of the assets of the Susan Thomas division. (Tr. 149)

On November 29, 1977 another meeting was held with Genesco executives. Nygard, Ebker, and Nygard's attorney attended this meeting. (Tr. 152) Ebker introduced Nygard to the Genesco executives and explained to them that Nygard had the funding to back the "Sportwork–Nancy Ebker" and the "Vivo" lines. (Tr. 154) During the course of this meeting, Nygard informed Genesco that he did not want to acquire the Marbrooke licensing agreement; Leonard Guiler, Vice–President in charge of the divestiture at Genesco advised Nygard that if they did not want to assume the Marbrooke contract then they had nothing further to discuss. (Tr. 157)

Nygard proposed a solution to the Marbrooke contract problem whereby Ebker would form a "dummy" corporation, which would assume the Marbrooke contract. This "dummy" corporation, which Nygard would fund, would have no assets and would be incorporated in Ebker's name. (Tr. 160) Ebker presented this solution to Genesco, who requested Nygard's guarantee that the "dummy" corporation would be fully funded and Ebker's guarantee that the Marbrooke contract would be fulfilled. (Tr. 164)

Subsequent to this meeting with Genesco, Nygard advised Ebker that "it looked like they had a deal." (Tr. 166) Ebker testified that the terms of the joint venture agreement were as follows: (1) Ebker and Nygard would be fifty/fifty partners in the Nancy Ebker company, which would continue with the apparel line formerly entitled "Sportwork–Nancy Ebker" (Tr. 166); (2) "Vivo" would thereafter be known as "Bianca", and Ebker would oversee the line, including designing it, until the point of actual production and for her services with respect to the Bianca line she would receive five percent of the pre-tax profits (Tr. 166–167); (3) Ebker would have complete control over the "Nancy Ebker" and "Bianca" lines (Tr. 167); (4) Ebker would remain at her offices at 1411 Broadway with the same staff (Tr. 167); (5) salaries would remain the same with the exception of those employees earning over $40,000 per year (Tr. 167); and (6) Tan Jay would handle all of the receivables and accounts payable in Canada. (Tr. 167) Additionally, Ebker agreed to contact all of her major accounts and advise them of the name change from "Vivo" to "Bianca." (Tr. 167)

Following their discussion of the terms of the joint venture arrangement, Ebker informed Nygard that they should put the terms of their agreement in writing. (Tr. 169) Nygard advised Ebker that they were partners and they would have to trust each other (Tr. 170); he did not want to involve lawyers at that point in time because he felt there was too much to do and that it would be a "big mess." (Tr. 169) Nygard persuaded Ebker to wait until February, 1978, when he would return to the United States, and assured her that at that time they would put their agreement in writing. (Tr. 170) Ebker agreed to this suggestion. (Tr. 171)

Following their oral agreement to enter into a fifty/fifty partnership, Nygard returned to Canada, and Ebker's attorneys prepared documents for the formation of the "Nanco Group, Inc." ("Nanco"), the "dummy" corporation proposed by Nygard for the assumption of the Marbrooke contract. Nanco was incorporated in December, 1977. (Ex. 12) Subsequently, Ebker notified Genesco that she had concluded a deal with Nygard. (Tr. 173) Thereafter Genesco entered into a purchase agreement with Tan Jay whereby Tan Jay was to acquire the assets of the "Susan Thomas" division and was also to assume the Marbrooke licensing contract and guarantee performance thereunder. (Ex. 13) Under the terms of this purchase agreement Tan Jay was obligated to acquire the leases for the showroom located at 1411 Broadway (hereafter "1411 Broadway showroom") and the showroom in Chicago. (Tr. 182; Ex. 16; Ex. 17) Additionally, Nanco was to acquire a lease on the warehouse premises located at 37th Street in New York City (hereafter "37th Street warehouse"), wherein the "Sportwork–Nancy Ebker" line was stored along with some piece goods of "Vivo." (Tr. 213; Ex. 22). Under the terms of the purchase agreement, Tan Jay guaranteed payment on the 37th Street warehouse lease. (Tr. 214)

On December 9, 1977 Genesco and Tan Jay consummated the transaction whereby Tan Jay acquired the assets of the Susan Thomas division (Ex. 13), although Nygard was not present at the signing of this agreement. (Tr. 183) The purchase price for the Susan Thomas division was $67,000. (Ex. 13; Tr. 173)

An advertisement was placed in "Women's Wear Daily" announcing the association of Ebker, Nygard, and Tan Jay. (Ex. 19) Ebker personally contacted all of her major clients on "Vivo" and explained the name change from "Vivo" to "Bianca," assuring them that the quality would be comparable to that of the former "Vivo" line. As a result of these efforts, no existing orders were cancelled. (Tr. 192) Ebker also notified the "Sportwork–Nancy Ebker" accounts that the name "Sportwork" was going to come off the label and the line would

henceforth be known as simply "Nancy Ebker." No orders were cancelled as a result of this notification, either. (Tr. 193)

In mid-December, 1977, scarcely a week after the closing, Ebker testified that it became readily apparent that the newly formed partnership was not being operated in the manner in which she had anticipated. She and her staff were "bombarded" with memoranda from Nygard explaining the way in which the new company would be run. (Tr. 194) Nygard decided to remove the only water cooler in the 10,000 square feet of space at the 1411 Broadway showroom—for a savings of $30 per month. (Tr. 195) Nygard sent Ebker a memo advising her and her staff that any purchase they made had to be approved by Tan Jay before it was made; unauthorized expenditures would not be acceptable to Tan Jay. (Tr. 199)

Ebker testified that during December, 1977 and January, 1978, she spoke to Nygard, who remained in Canada, on an almost daily basis. (Tr. 206) She expressed her concern to Nygard that the "Bianca" line had not yet been cut and would not be completed by its scheduled shipping date. (Tr. 207) Nygard advised Ebker that he did not have the staff to cut the "Bianca" line in California, and insisted that she send Jerry Pepe, Ebker's production person on the "Nancy Ebker" line, to California to supervise the cutting of the "Bianca" line. (Tr. 207) When Ebker protested that by sending Pepe to California she would not be able to finish the "Nancy Ebker" line in time for its scheduled shipping date (Tr. 207), Nygard informed her he "didn't give a damn" about the "Nancy Ebker" line; that his paramount concern was the "Bianca" line. (Tr. 207) Ebker sent Pepe to California. Pepe telephoned her shortly after his arrival in California and advised her that it would be impossible for him to get the "Bianca" line up to the same quality level as it had been the year before, and that the "Bianca" line would be late for delivery. (Tr. 211) Ebker testified that in the fashion industry a late delivery is equivalent to an automatic cancellation of a

customer's order (Tr. 211), and that timing in the fashion industry is critical. (Tr. 309)

Nygard sent Ebker various other memoranda which were directly at variance with her understanding of how the partnership would be conducted. (Ex. 23) Although Nygard had assured Ebker and her staff that they would receive the same salaries as they had prior to the inception of the joint venture, he attempted to decrease the salaries of her sales staff at the end of December (Tr. 219); as a result, three of Ebker's key salespeople decided to leave. (Tr. 219) When Ebker advised Nygard that some of the sales staff had resigned, he told her that his sales force would take care of "Bianca" and the "Nancy Ebker" line if necessary. (Tr. 220)

In addition to the changes Nygard was attempting to implement, Ebker was also concerned about certain advertising that Nygard had placed in Canada, which, according to Ebker, implied that Tan Jay had the right to use the "Nancy Ebker" name in Canada, in violation of the terms of the Marbrooke licensing agreement. (Tr. 202) When Ebker brought this fact to Nygard's attention and advised him that Marbrooke was threatening to sue, Ebker testified that Nygard informed her that he wanted her to "get rid of" the Marbrooke agreement. (Tr. 203)

Nygard sent a memo to Ebker dated January 16, 1978, in which he reneged on his promise that her staff would receive the same salary that they had prior to the inception of the joint venture. (Ex. 23; Tr. 221) Ebker advised her staff that Nygard had changed the terms of their agreement, and that she would take care of the situation when their agreement was reduced to writing in February, 1978. (Tr. 224)

Ebker complained to Nygard about the changes he was making. In response, he advised her that he was the director of all the companies and she was merely the manager, and that she had to follow his "orders." When Ebker protested that they were partners, she testified that Nygard "screamed" at her and would not listen to her protests. (Tr. 229) Ebker also testified that Nanco's bills were not being paid, and that she was using her own personal funds to pay Nanco's bills. (Tr. 240)

During this time period spanning December, 1977 through January, 1978, Nygard provided Ebker with a list of projections he had prepared for the southeast territory with respect to the "Bianca" and "Nancy Ebker" lines. (Ex. 24) This territory consisted of approximately twenty percent of the total market in the United States. (Tr. 250) The projections indicated that in the fifth year of the venture, the "Bianca" line would be generating approximately $8,600,000 worth of gross sales in the southeast territory, and the "Nancy Ebker" line would be generating $4,250,000. (Ex. 24; Tr. 251) Nygard advised Ebker that he believed the projections were conservative. (Tr. 249)

Ebker and Nygard's next meeting took place on February 13, 1978, at the 1411 Broadway showroom. (Tr. 252) Leamond Dean, Ebker's assistant designer, and Paul Saxe, the marketing vice-president, were present at the meeting. (Tr. 253) Nygard demanded to know if Ebker had sent his draft letter to Marbrooke, informing them that they would not be renewing the licensing agreement in Canada. (Tr. 252) Ebker told Nygard she had not sent the letter and Nygard demanded to know why she had not followed his orders. (Tr. 252) Ebker begged Nygard to calm down and told him that her architect, Philip Baldwin, was waiting outside the office with plans for the revision of the showroom. (Tr. 253) Nygard had previously agreed to a $50,000 budget for renovations. (Tr. 168) Baldwin presented his plans for the showroom renovation; Nygard told Baldwin he had not authorized the plans, and proceeded to show those persons present his set of plans for the renovation. Pursuant to Nygard's plans, Ebker's office was moved to the back of the showroom to an area which was at that time a storeroom. (Tr. 254) Ebker protested that they were partners, and that he could not do this; Nygard replied, "[u]nfortunately for you I'm the partner with the money." (Tr. 254) Leamond Dean corroborated the testimony of Ebker as to what transpired at this meet-

ing. (Tr. 396) Ebker proceeded to give Baldwin a check out of her own personal funds to cover his expenses. (Tr. 255) She left the office that day and made an appointment with her attorney for the next day. (Tr. 254)

The following morning, February 14, 1978, while Ebker was at the office of her attorney, she received a call from Paul Saxe, who informed her that Nygard had gathered everyone together and told them Ebker was fired and that he was taking over "Nancy Ebker" and "Bianca." (Tr. 256) Ebker arrived at the 1411 Broadway showroom at approximately 11:30 a.m. that day; Leamond Dean and Christina Dabbs, Ebker's administrative assistant, were in the process of packing her personal belongings. (Tr. 257) Ebker and Nygard proceeded to have a conversation. (Tr. 257)

Ebker and Nygard relate dramatically different versions of their February 14, 1978 conversation. Ebker testified that Nygard confronted her in the showroom in the presence of Leamond Dean and Paul Saxe and told her that she was "fired," that he had ordered Leamond Dean and Christina Dabbs to pack her personal belongings, and that he wanted her "the hell out" of there by that afternoon. (Tr. 258) Ebker and Nygard then went into Ebker's office so that they could talk privately. (Tr. 258) Ebker testified as follows as to their conversation:

Q: What was the conversation? ...

A: I said to him, Peter, you are going to destroy three viable companies. What are you doing? He said, no one has ever disobeyed my orders and gotten away with it. I said, Peter, you must listen to reason, we are in the middle of designing Nancy Ebker and Vivo/Bianca fall. I said, if you get rid of me now, you are going to have nothing. He said, my line is designed already, you told me it is designed. I said, it is designed on paper, it is not designed, you do not have samples. If you do this now you will not have a Vivo/Bianca line and you will destroy Nancy Ebker and you will ultimately destroy Marbrook [sic] up in Canada. He said I never gave a damn about Marbrook [sic], I never intended to do Marbrook [sic] and I never intended to fund your highfalutin line. He said I have what I want, I have my $12 million Vivo line. He said it is already designed for the next four months. He said, I have the assets, I have a showroom here for less than $10 a square foot, I have all your patterns, I have everything. I own everything. I said, Peter, you can't do this, we're partners. He said, we have nothing in writing and I never intended to put anything in writing. I said, you can't do this, this is the United States and we are partners. He said, you have nothing, I am a millionaire. He said, if you want anything pertaining to Nancy Ebker, you are going to pay me a million dollars since I will no longer have the benefit of using your name. I said, Peter, you cannot do this. I said let's try to reason. I will finish designing Vivo/Bianca, I will finish designing my line, we will separate in an equitable way. Let me go out and find funding for Nancy Ebker. I can probably go back to Lynn Wear. He said, no, he said, you will pay me a million dollars by Friday for everything pertaining to Nancy Ebker including the patterns, the samples and the orders Genesco gave you. And he said, if you don't have a million dollars by Friday, I am going to see to it that your name and reputation are totally destroyed in this market. Then he said I don't think that should be too difficult considering you are just a woman just a designer. He said, now, you get the hell out of here by this afternoon.
(Tr. 260–261)

When Ebker protested that Nygard had taken all of her records, Nygard told her that he owned everything in the 1411 Broadway showroom. (Tr. 262) Nygard demanded Ebker leave her key to the premises; when she protested, Nygard became agitated and Ebker gave him her key. (Tr. 264–265)

Nygard's version of what transpired during the February 14, 1978 meeting at the 1411 Broadway showroom contrasts starkly with the version related by Ebker. Nygard testified that his conversation with

Ebker was not a heated, impassioned dialogue as Ebker related, but rather a calm conversation to the effect that the joint venture was not satisfactory between the two of them and that Nygard wanted to terminate the arrangement in an amicable fashion and give Ebker a chance to make other arrangements. Nygard testified as follows:

> THE WITNESS: I said in effect that I did not feel the arrangements under which we were working was working to either one of our satisfaction, and that I wished to terminate this arrangement and really not go on with the company. I wanted to do it amicably and I wanted to give her every opportunity to find other arrangements or other financiers, other business partners to carry on with her name. I did not wish to go ahead with her name, Nancy Ebker, or really have anything to do with that part of the product name. I understood that her name was important to her, and it was not important to me. I offered to her any way I can to have a smooth transition, and I suggested and highly recommended that we keep this very amicable and do it as smoothly as we can so it would not hurt either one of us.
>
> THE COURT: Let me interrupt. Did Ms. Ebker remain silent while you were saying what you have just testified to or did she interrupt to say anything as you recall?
>
> THE WITNESS: I recalled her staying quite calm and silent.
>
> THE COURT: Yes. And when you got through with saying what you have just testified to, did she respond or say anything at all?
>
> THE WITNESS: She only responded that she feels that same way, seemed to be more silent than I anticipated, that is, she did not have major discussions but just said leave it with me, and responded that she was going to go out and find herself other financiers, other business partners. I seem to recall that—and also responded that she will make other arrangements to have her staff so that it was close to her to start packing her personal things, her design ideas, to have a smooth transition.
>
> THE COURT: And what was the next thing that happened or was said?
>
> THE WITNESS: During that meeting?
>
> THE COURT: Yes, of course. You said it lasted about an hour.
>
> THE WITNESS: How much time we would have for this transition, when it would take place, when would the—how we would handle the products that were in the process of being produced and shipped to the customers, "Do I have my own"—her statement—"do I keep my own label" and "I would like to keep it, that's my name." I said "I agree with you, it is your name, you can certainly have it, I don't want any part of it." Trying to wind up outstanding business. "Do I have my other design team"—DeLemont [sic], I think was the designer that she had. I said, "You can have all the staff that you have brought into this equation, you are welcome to them, anybody you want to have is yours." We had discussions about sorting out who was going to have what.

(Tr. 573–575)

With respect to the conflicting testimony of Ebker and Nygard with regard to this conversation, we entertain no hesitation whatsoever in adopting completely the testimony of plaintiff. We were favorably impressed by the straightforward testimony of Ebker, and found her to be a sincere and candid witness. She impressed us with her veracity and consistent testimony. Furthermore, defendants' repeated attempts to impeach the credibility of Ebker only served to reinforce our conviction that Ebker was a highly credible witness.

Corroborating testimony for plaintiff's version of the events which transpired on February 14, 1978 was provided by plaintiff's witness Leamond Dean, whom we also found to be a sincere and credible witness. Dean testified that on February 14, 1978 Nygard called the staff together and told them that he had fired Ebker and that he would be running the company, and that if anyone quit they would not get worker's compensation. (Tr. 399) Nygard

asked Dean to get all of the charts with the layouts of the collections together and bring them to him; he also told Dean and Christina Dabbs, Ebker's administrative assistant, to pack all of Ebker's belongings. (Tr. 400) Dean also corroborated Ebker's testimony that following his firing of Ebker, Nygard posted a guard outside the door of the 1411 Broadway showroom. (Tr. 401)

In stark contrast with the candid and credible testimony of Ebker and Dean was that of Nygard. Nygard's demeanor on the witness stand was evasive and insincere, and he contradicted himself on numerous occasions throughout the course of his testimony. On direct examination, Nygard testified that he and Ebker discussed the termination of their joint venture in a calm fashion, with both parties attempting to amicably go their separate ways. On cross examination, Nygard admitted that he "dismissed" Ebker and testified that he "believed" that he may have asked her to return her keys to 1411 Broadway, where Ebker maintained her office. (Tr. 592) Nygard "couldn't recall" whether he had an argument with Ebker about returning her keys. (Tr. 593) Nygard also admitted on cross examination that he brought in security guards and that he "might" have changed the locks to the 37th Street warehouse (Tr. 596, 629) which lease was in the name of Ebker's company, Nanco.

Nygard also gave inconsistent testimony with respect to the design of the "Bianca" line. Although Nygard advised the press that Ebker designed the "Bianca" line, he denied this at trial and testified that "Bianca" was designed by a Canadian design team. (Tr. 594; 631) This testimony was totally unsubstantiated by any other witness at trial. In fact, Ebker (Tr. 233–234), Dean (Tr. 692; 694), and the exhibits introduced at trial clearly reveal that it was Ebker and Dean who designed the "Bianca" line, and not, as Nygard maintained at trial, a Canadian design team. (Ex. 31) Furthermore, Nygard testified at trial that the first time he heard of Ebker was in the fall of 1977. (Tr. 591) Various exhibits introduced at trial directly contradict his testimony. (Ex. 33; 20; 31) We unhesitatingly find the testimony of Nygard utterly lacking in credibility, and we reject his testimony insofar as it contradicts that of plaintiff.

Following Nygard's dismissal of Ebker on February 14, 1978, Nygard instructed Ron Charney, the production coordinator of the joint venture, to contact Ebker's suppliers and advise them that Tan Jay was not responsible for Ebker's purchases and sales made during the course of the joint venture. (Tr. 554) In addition, Nygard instructed Charney not to accept any fabrics purchased by Ebker for the fall "Nancy Ebker" line. (Tr. 555) Charney also cancelled Ebker's orders for her fall 1978 line per Nygard's instructions. (Tr. 556) Nygard disseminated a letter to Ebker's "Nancy Ebker" accounts dated March 31, 1978, (Ex. 27) which stated that "[w]e have had a serious misunderstanding with key people of the Ebker group and have been denied free and easy access to our shipping facility." The letter informed the customers that Tan Jay would not be able to ship the "Nancy Ebker" merchandise which had been ordered. (Ex. 27)

### The February 28, 1978 lockout

Ebker testified that on February 28, 1978, at approximately 4:30 p.m., she went to the 37th Street warehouse, motivated by reports from her former staff that the "Nancy Ebker" merchandise was being shipped in total disarray and with her name still on the garments. (Tr. 268) When Ebker arrived at the premises, she observed that approximately fifty percent of the "Nancy Ebker" line which was scheduled for February 28th completion and shipment was still in the warehouse. (Tr. 269) Ebker requested that the employees who were present leave the premises and take their personal belongings with them. (Tr. 269) Ebker, with the assistance of a locksmith, proceeded to have the doors of the premises welded shut. (Tr. 269) The following day, March 1, 1978, Ebker received a call from the police; three persons who worked for Nygard had broken into the warehouse and triggered the alarm system. (Tr. 270)

Ebker testified that the 37th Street warehouse housed all of the goods for the "Nan-

cy Ebker" line, including finished "Nancy Ebker" merchandise, "Nancy Ebker" summer fabrics and piece goods, "Nancy Ebker" fall fabrics (Tr. 280), some fall "Bianca" piece goods and some samples for the fall "Bianca" line (Tr. 313), as well as patterns for the "Nancy Ebker" and "Bianca" lines. Nygard's testimony as to the contents of the warehouse was not at variance with Ebker's. (Tr. 582)

*The October 12, 1988 hearing*

On March 3, 1978, pursuant to an Order to Show Cause filed by defendants (Hearing Ex. AA)[5], Nygard, Ebker, Nygard's counsel John Triggs, Ebker's counsel Jay Gordon, and Ron Levine, Gordon's assistant and also an attorney, appeared before the Honorable Alfred M. Ascione, a Justice of the Supreme Court of the State of New York. This conference was the subject of a post-trial evidentiary hearing before us on October 12, 1988. At the October 12th hearing, plaintiff moved to include the testimony and evidence introduced before Justice Ascione as part of the trial record to which defendants objected. (Hearing Tr. 112–118)[6] We reserved decision on these motions. (Hearing Tr. 118)

The testimony and evidence introduced at the hearing revealed the following: On March 3, 1978, Judge Ascione met with the aforementioned persons in his chambers, without the presence of a court reporter. (Hearing Tr. 13) Nygard and Ebker explained their respective positions to Judge Ascione, and he made certain suggestions to the parties. (Hearing Tr. 17)

At the hearing before us, Ebker and Jay Gordon, plaintiff's former counsel, testified as to their understanding of the agreement reached before Judge Ascione. John Triggs, counsel for defendants both at the time of the conference and to date, declined to testify at the hearing, nor did defendants call any witnesses to testify.

Ebker testified that Judge Ascione made the following suggestions, to which the parties agreed: (1) that Nygard would give Ebker the keys to the 37th Street warehouse; (2) that the "Nancy Ebker" merchandise remaining on the premises at the 37th Street warehouse and scheduled for February 28, 1978 completion would be shipped by Ebker with the assistance of Ebker's shipping manager, Eli Hyman, and that Tan Jay would pay for the shipping; (3) copies of all invoices with respect to merchandise that had previously been shipped would be supplied to Ebker; (4) copies of invoices for all remaining merchandise that was to be shipped in the future would be kept and the accounts receivable generated therefrom would be held in an interest bearing escrow account; (5) Tan Jay or Nygard would advance the rent for the 37th Street warehouse; (6) certain piece goods for the "Bianca" line would be shipped to California after Nygard posted a $50,000 bond; and (7) the remaining contents of the 37th Street warehouse would remain undisturbed pending settlement agreements between Ebker and Nygard. (Hearing Tr. 18–22) Ebker testified that the foregoing terms were reduced to a handwritten agreement on March 4, 1978 and signed by counsel for Ebker and Nygard. (Hearing Tr. 26)

Ebker testified that in furtherance of this agreement, she went to the 37th Street premises on March 4, 1978 and was provided with duplicate keys by John Triggs. (Hearing Tr. 26) She proceeded to call all of her accounts and asked them if they would accept late delivery; they verbally agreed. (Hearing Tr. 27) Ebker, with the aid of Christina Dabbs, her assistant, and Eli Hyman, Ebker's shipping manager, pressed and packed the "Nancy Ebker" merchandise scheduled for February 28, 1978 shipment. (Hearing Tr. 26) Ebker returned the following day, March 5, 1978, and continued to press and pack the "Nancy Ebker" merchandise. (Hearing Tr. 31) On March 6, 1978, Ebker again returned to the 37th Street warehouse; United Parcel Service

---

5. The references to "Hearing Ex." followed by a letter or a number indicate exhibits introduced at the October 12, 1988 post-trial hearing.

6. To avoid confusion with the "Tr." references, the reference "Hearing Tr.", followed by a number, will be employed to indicate pages of the official transcript of the October 12, 1988 hearing.

picked up the "Nancy Ebker" goods which had been packed by Ebker over the weekend. (Hearing Tr. 35)

Jay Gordon, Ebker's former counsel, corroborated Ebker's testimony as to what transpired at the March 3, 1978 hearing before Judge Ascione, and in particular as to each and every item of the agreement reached between the parties. He testified that this agreement was reduced to writing and signed by counsel for Nygard and Ebker. (Hearing Tr. 67) Gordon no longer had a copy of this written agreement, nor was it introduced into evidence at the hearing. (Hearing Tr. 67)

*The removal of the contents of the 37th Street warehouse*

Ebker, Dean, plaintiff's witness Ron Charney, and Nygard all testified that Nygard and his staff removed the contents of the 37th Street warehouse on or about March 6, 1978. Dean testified that he went to the premises on either March 6th or 7th, 1978, and observed a number of people dumping everything from the warehouse, including fabrics, patterns, etc. into pushcarts at a frantic pace. (Tr. 404) Ebker testified that on March 6, 1978, she was present when a group of approximately fifteen men, led by a Tan Jay employee, appeared at the 37th Street warehouse and proceeded to remove its contents. (Tr. 283–284) Ebker testified that all that remained in the warehouse were a few cutting tables and some desks. (Tr. 285)

Ron Charney, former General Manager of the "Susan Thomas" division at Genesco and an employee of the newly formed venture between Ebker and Nygard, testified that everything with the exception of a scale was removed from the 37th Street warehouse (Tr. 556), and that this event occurred prior to March 15 or 16th, 1978. (Tr. 557) Nygard admitted at trial that he gave the order to remove the contents of the 37th Street warehouse. (Tr. 603)

*Repercussions of the February 28, 1978 lockout*

Nygard testified that the February 28, 1978 lockout from the 37th Street warehouse premises had a disastrous impact on Tan Jay (Tr. 584), forcing it to accept over $2,000,000 of rejected merchandise and setting Tan Jay back over two to three years in the development of their business in the United States. (Tr. 587) Nygard estimated the total cost of the lockout to Tan Jay to be approximately $7,000,000–$10,000,000. (Tr. 589)

Court Joel, Vice–President of finance at Tan Jay in 1978, also testified with respect to the impact of the February 28, 1978 welding of the doors at the 37th Street premises (Tr. 666–668; Ex. C), and as to the ultimate financial results of the venture between Nygard and Ebker. (Ex. C; Tr. 641) Joel evaluated the venture during a time period which spanned December, 1977 to July, 1978, when, according to Joel, the venture was ultimately wound up. (Tr. 643) He concluded that the venture lost a total of $796,798.79. (Tr. 653; Ex. C) Furthermore, Joel testified that for the time period of the venture, Tan Jay suffered unprecedented losses as a result of an unusually high number of returns and markdowns of merchandise. (Tr. 666) At the conclusion of Joel's testimony, plaintiff objected to and moved to strike both the testimony of Joel as well as Exhibit C. (Tr. 684) We reserved decision on this motion. (Tr. 686)

We find by a fair preponderance of the credible evidence that Tan Jay suffered no financial loss as a result of the February 28, 1978 lockout, and that any losses which it did incur thereafter were solely the result of the conduct of Nygard and Tan Jay employees. Our finding is based on the following facts: Both Ebker and Nygard testified that the 37th Street warehouse contained the "Nancy Ebker" line as well as some piece goods and samples for the "Bianca" fall line. (Tr. 313; 582) Ebker testified that when she arrived at the 37th Street premises on February 28, 1978, she observed that approximately fifty percent of the "Nancy Ebker" line, scheduled for February 28, 1978 shipment, was still hanging in the warehouse. (Tr. 269) Tan Jay offered no evidence that it was in the process of shipping the merchandise when Ebker arrived on the scene. Furthermore, Ebker did not weld the doors shut until

4:30 p.m.; it would be unlikely that Tan Jay intended to ship the remainder of the "Nancy Ebker" line by the end of that day, nor was any evidence offered to the contrary by Tan Jay. (Tr. 269) Additionally, on March 4 and 5th, 1978, Ebker personally contacted all of her accounts and asked them if they would accept late delivery; they all agreed to do so. (Tr. 272–273) All of the "Nancy Ebker" merchandise scheduled for February 28, 1978 completion was shipped out on March 6, 1978. (Tr. 283) Tan Jay offered no evidence that *any* of the merchandise shipped out by Ebker and Eli Hyman on March 6, 1978 was rejected or returned. Indeed, it was the merchandise shipped out by Tan Jay which was rejected. Ron Charney, General Manager of fabric purchasing and production coordinator for the "Susan Thomas" division as well as the newly formed venture between Nygard and Ebker, testified that the goods removed from the 37th Street warehouse at Nygard's direction were haphazardly packed and shipped by Tan Jay, and it was *those* goods, and not the goods shipped by Ebker, that were returned. (Tr. 558) Charney testified that the goods were returned because of the manner in which they had been shipped; the merchandise was "thrown" into boxes and merchandise that was supposed to be shipped as a group was shipped a few items at a time. (Tr. 559) Additionally, the "Nancy Ebker" label had been removed from the goods which were shipped by Tan Jay; customers who had ordered "designer" garments from the "Nancy Ebker" line, and who were anticipating receiving such garments with the "Nancy Ebker" label on them, were receiving garments without labels on them. (Tr. 559) Nygard testified that the labels were removed out of sensitivity to Ebker. (Tr. 608)

Furthermore, we find that Charney was clearly an unbiased witness; although he was called as a witness for plaintiff, he testified that he remained with Nygard after the "firing" of Ebker, and ultimately terminated his employment with Nygard on amicable terms. (Tr. 557) We found his testimony credible and sincere, and unhesitatingly accept it *in toto*.

Accordingly, we entertain no doubt that it was the conduct of Nygard and his staff, and not Ebker, that caused Tan Jay's "disastrous" entrance into the United States market, and find by a fair preponderance of the credible evidence that any monetary loss suffered by Tan Jay with respect to the returns of "Nancy Ebker" and "Bianca" merchandise was solely attributable to its own conduct, and not that of plaintiff.

*The assets contributed by Ebker to the joint venture*

Plaintiff testified that she brought the following valuable assets to the partnership: (1) the "Nancy Ebker" name (Tr. 300); (2) her reputation and expertise in the fashion industry (Tr. 301); (3) the "Vivo" and "Sportwork–Nancy Ebker" going concerns (Tr. 305); (4) her management team (Tr. 308); (5) the opportunity to purchase the assets of the "Susan Thomas" division for a fraction of their market value (Tr. 318); (6) a favorable lease at $10 per square foot on the 1411 Broadway showroom and a lease on the Chicago showroom premises (Tr. 319); and (7) five hundred patterns on the "Vivo" and "Sportwork–Nancy Ebker" lines. (Tr. 301)

On cross examination, Ebker admitted that both her design talent (Tr. 340) and her retail store following were assets that would remain with her despite the fact that she no longer was associated with Nygard. (Tr. 326–327) Plaintiff's expert, Bill Sothern, testified that in 1979, following Nygard's "firing" of Ebker, she retained an excellent reputation and a high degree of skill as a designer. (Tr. 501–502) The 500 patterns which Ebker claims she contributed to the joint venture had been created while Ebker was employed at Genesco (Tr. 325) and these patterns were purchased by Tan Jay when it acquired the assets of the "Susan Thomas" division. (Ex. 13) Ebker acknowledged that by the spring of 1978, no merchandise with her name on it was being shipped (Tr. 344), and that her name was not used in advertising after May, 1978. (Tr. 324) In addition, approximately three months after Nygard "fired" Ebker, all but one person on her management team had left Nygard's employ. (Tr. 361)

Furthermore, Ebker admitted that she willingly and knowingly contributed the assets enumerated above to the joint venture. (Tr. 343)

To substantiate the value of the assets which Ebker claimed she contributed to the joint venture, plaintiff relied upon the testimony of two expert witnesses, Bill Sothern and David Bernstein, both of whom testified as to monetary value of enumerated assets. Defendants objected to the introduction of this testimony and moved to strike it; we denied the motion and granted leave to renew. (Tr. 515; 546) Defendants renewed their motion to strike the testimony of plaintiff's experts in their post-trial papers.

Bill Sothern, an accountant with twenty years' experience, and in particular with experience in the apparel industry (Tr. 408, 410), testified that he first heard of Nancy Ebker in 1974 in relation to "Act III", which, according to Sothern, was at that time the best known, most successful and most copied firm in the fashion industry. (Tr. 474) He testified that the name "Nancy Ebker" was a "household word" within the industry. (Tr. 479)

Sothern testified that if a company could use a designer's recognized and respected name, it could charge a premium for its merchandise. (Tr. 461) He focused his testimony on the worth of Ebker's name in 1977 and 1978. (Tr. 420) In reaching his opinion as to the value of the "Nancy Ebker" name, Sothern studied the annual reports of the Jonathan Logan company, one of Ebker's former employers, for the years 1968–1972, and the actual sales figures that the "Nancy Ebker" and "Vivo" lines had generated in 1977, as well as Ebker's five year projections for the "Vivo" and "Nancy Ebker" lines. (Tr. 496; Ex. A; B)

Sothern testified that the "Vivo" and "Nancy Ebker" lines which Ebker contributed to the venture were part of a going concern business that was generating $10,000,000 in gross sales. (Tr. 490) He also placed a value on the other assets which Ebker maintained she brought to the joint venture, including her reputation, her expertise in design, management and operation. (Tr. 484; 486) Sothern declined to offer an opinion as to the worth of the five hundred patterns, or the value of the assets purchased at a discount from Genesco. (Tr. 490–491) Sothern concluded that the net worth of the assets which Ebker contributed to the joint venture was approximately $15,000,000. (Tr. 494–493) Sothern conceded that in arriving at this figure he relied in part upon the projections provided to him by Ebker. (Tr. 498) Sothern admitted on further direct examination that a partner who knowingly and voluntarily contributes assets to a partnership assumes a risk that the partnership may not be profitable. (Tr. 425)

We found plaintiff's witness Sothern to be a credible and knowledgeable witness, well versed in the apparel industry and in the evaluation of the worth of such businesses. We nevertheless reserve our conclusion as to the admissibility and relevance of his testimony and withhold our reasoning for the subsequent legal discussion, *infra*.

Plaintiff's other expert witness, David Bernstein, a registered Public Accountant with thirty two years' experience in the business (Tr. 516), testified that he first met Ebker during her tenure at "Act III." Bernstein testified that his specialty in the accounting field is auditing apparel firms, and he has by necessity become familiar with every aspect of the apparel industry. (Tr. 518)

Bernstein reviewed the Jonathan Logan financial reports for the years 1968–1980 in preparation for rendering his opinion as to the value of the assets that Ebker brought to the venture. In addition, Bernstein reviewed a "Standard and Poor's" report on the "Liz Claiborne" company. (Tr. 521) Bernstein concluded that the value of the assets which Ebker brought to the joint venture was approximately $15,000,000–$30,000,000. (Tr. 528) He based his opinion upon the sales comparisons set forth in Defendant's Exhibits A and B (Tr. 529), from the actual sales performance of "Act III" set forth in those exhibits (Tr. 530), from the actual performance of the "Liz Claiborne" company (Tr. 533), and from the

"Standard and Poor's" over-the-counter stock reports for the "Liz Claiborne" company for the years 1977–1986. (Tr. 533) In addition to evaluating the worth of the Nancy Ebker name, her reputation, and management team, Bernstein testified that the value of the five hundred patterns contributed by Ebker was $1,500 each, for a total of $750,000. (Tr. 535)

On cross examination, Bernstein admitted that he based his evaluation of the worth of the assets which Ebker brought to the joint venture on the assumption that the venture was to continue for a period of five years. (Tr. 538) In addition, Bernstein made the assumption that the success of the venture between Nygard and Ebker would have paralleled that of "Act III" and the Liz Claiborne company. (Tr. 539) He also admitted that he had never seen the five hundred patterns to which he assigned a value of $750,000. (Tr. 539)

We find that Bernstein was also a knowledgeable and credible witness; we nevertheless must reserve our decision as to the admissibility and relevance of his testimony and again, save the reasoning for our discussion of the legal merits of plaintiff's case.

*Ebker's employment following the termination of the joint venture*

The parties agree that following Nygard's "firing" of Ebker, she accepted the following positions during the time period spanning May, 1978 to July, 1979:

(1) In or about May, 1978, a position as a free lance consultant for R & K Dress, a division of Jonathan Logan, for a flat fee of $10,000; (2) In or about November, 1978, a position as a free lance consultant for Leonard Sunshine, Inc., for a flat fee of $10,000; (3) In or about February, 1979, a position as a free lance consultant for Charlotte Ford, Inc., for a flat fee of $10,-000; and (4) A position with Charlotte Ford, Inc., for a base salary of $65,000 plus five percent of the pre-tax profits on a blue jeans line. (Joint Pre-trial Order, dated November 24, 1986, Uncontested fact (g) 1–4.)

## THE LAW

### I. Objections by counsel for defendants

Prior to addressing the substantive claims of the parties, we are obliged to rule on the following objections by counsel:

A. *Objection by counsel for defendants to the testimony of plaintiff's experts, Bill Sothern and David Bernstein.*

■ Defendants objected both to the relevance and the admissibility under Federal Rule of Evidence 703 of the testimony of plaintiff's expert witnesses, Bill Sothern and David Bernstein, both of whom testified as to the value of Ebker's name, reputation, and expertise in the marketplace. In addition, Bernstein placed a monetary value on the five hundred patterns which plaintiff alleges that she contributed to the venture. Defendants maintain that the testimony of the experts is inadmissible because the experts relied on projections supplied by Ebker to determine the value of what Ebker's name and reputation were worth, that the experts relied on sales comparisons from "Act III" in order to reach their conclusion, and on sales figures from the "Liz Claiborne" company, a company with which plaintiff had no association. Furthermore, both experts based their testimony as to the worth of the Ebker name on the assumption that the joint venture was to continue for a period of five years.

In spite of the fact that we found plaintiff's experts to be knowledgeable and credible, we nevertheless are constrained to agree with defendants that the testimony of plaintiff's experts must be stricken *in toto*. We note that both experts based their opinions on the value of the assets which Ebker contributed to the joint venture on the assumption that the venture was to continue for a period of five years; however, this assumption was erroneous. Our Circuit Court has previously held that the joint venture was one terminable at the will of either party, and therefore any analysis of the worth of the Ebker name, reputation, etc., based upon a five year time period is both inaccurate and irrelevant.

Furthermore, both experts based their opinions in part upon sales projections of Ebker's former employer, Act III. However, plaintiff failed to establish the relevance of the sales figures for Act III to the newly formed joint venture. Once again, we must agree with defendants that insofar as plaintiff's experts relied on the sales figures for Act III in reaching their opinion as to the worth of the assets which Ebker contributed to the joint venture, that testimony is irrelevant and must be stricken.

Lastly, plaintiff's expert Bernstein relied upon sales figures from the Liz Claiborne company, an enterprise in no respects connected to plaintiff, to establish the worth of the assets which Ebker brought to the joint venture. Here again, plaintiff utterly failed to establish any nexus between plaintiff and the venture with Nygard and the Liz Claiborne company. We therefore find that any such testimony is irrelevant and accordingly must be stricken.

B. *Objection by counsel for defendants to the testimony and exhibits introduced at the October 12, 1988 hearing.*

Defendants objected to the testimony and exhibits introduced at the October 12, 1988, hearing on the following grounds: (1) the conference before Judge Ascione was a settlement discussion, and therefore inadmissible under New York law; and (2) any claim that Nygard breached an agreement entered into before Judge Ascione is barred by laches, since it was never raised in the complaint or in the subsequent pre-trial order.

We do not accept defendants' contention that the conference before Judge Ascione consisted solely of settlement discussions. Both Ebker and her former counsel, Jay Gordon, testified that while settlement was in fact discussed at the conference, the parties were unable to agree and therefore Judge Ascione concentrated on diffusing the immediate situation, namely the February 28, 1978 lockout. Defendants, as we noted previously, offered no testimony at this hearing. Accordingly, we find that although settlement may have been dis-cussed at the conference, it could in no respects be classified a "settlement conference" and accordingly defendants' objection to the introduction of this testimony on the grounds that it constituted settlement discussions is without merit.

We now turn our consideration to defendants' second legal theory in support of their contention that the testimony and exhibits introduced at the October 12, 1988 hearing should not be made a part of the permanent trial record since any claim based upon such evidence is barred by laches.

New York courts require that an equitable right be asserted by the one who possesses it. *See Mikulec v. United States*, 705 F.2d 599 (2d Cir., 1983). Indeed, equity will not afford relief to one who has neglected his legal rights. *See Rogers v. Board of Trustees*, 130 Misc. 204, 206, 223 N.Y.S. 740, 743 (Sup.Ct. Erie Co., 1927). Where a plaintiff has had knowledge of the existence of certain rights, or might have acquainted himself with them by the use of reasonable diligence, it would be inequitable to permit him to assert them if the lapse of time is so great as to prejudice the defendant as to his defense. *See Varconi v. Unity Television Corp.*, 11 Misc.2d 191, 196–197, 173 N.Y.S.2d 201, 206 (Sup.Ct. N.Y., 1958).

Under the circumstances, we must agree with defendants that any claim arising out of the conference before Judge Ascione is barred by the equitable doctrine of laches. Plaintiff commenced this action in 1978; there have been since that time amendments to both the complaint and the pre-trial order. At no time, until the 1987 trial of this action, did plaintiff attempt to offer evidence or assert a claim based on an alleged handwritten agreement between counsel for the respective parties following the conference before Judge Ascione. Nor does plaintiff offer any explanation as to why she did not attempt to include such a claim in the pre-trial order that was submitted to us prior to trial. This evidence was not newly discovered evidence, but was known to plaintiff since the inception of this twelve year old action. According-

ly, we find it would be inequitable at this late date to allow this evidence, or any claim based thereon, to become a part of the trial record.

### C. Objection by counsel for plaintiff to Exhibit C and the testimony pertaining thereto.

Plaintiff objected to the testimony of defendant's witness Court Joel with respect to Exhibit C, a balance statement prepared by Joel and his staff allegedly showing the financial results of the "Nancy Ebker" and "Bianca" lines for the time period from the inception of the venture until it was ultimately wound down. Plaintiff's objection was based on the fact that Exhibit C recorded only the ultimate financial results of the joint venture, and failed to take into account the effect of the cancellation notification to Ebker's customers in March, 1978, or the financial effect of the winding down period on the venture. Although counsel for plaintiff indicated to the Court that the objection to Joel's testimony and the introduction of Exhibit C would be briefed in post-trial papers, (Tr. 684), plaintiff failed to do so. We accordingly find plaintiff's contention that both the testimony of Court Joel and Exhibit C should be stricken without merit, although we reserve our opinion as to its pertinence for our subsequent discussion of the substantive issues in this case.

### II. The Substantive Claims

Plaintiff claims that commencing in early February, 1978, Nygard and Tan Jay breached and repudiated the joint venture agreement entered into between Nygard and Ebker by (a) removing Ebker as president and chief executive and operating officer of the company; (b) giving notice of Ebker's termination of employment by and association with the company; (c) excluding Ebker physically from the company's premises and Nanco's premises and preventing her from performing her duties as an officer and employee of both the company and Nanco; (d) giving notice that the employment of key personnel, constituting Ebker's management team, was being terminated and actively soliciting and seeking to transfer the loyalty of others to Tan Jay; (e) announcing to the company's suppliers and others that Ebker was not authorized to make contracts and commitments on behalf of the company and Nanco which she had, in fact, made within the scope of her authority; (f) refusing to continue to supply the funds required by Nanco and the company for obligations regularly and properly incurred in the course of operation of the company's business; (g) preventing Ebker from completing the design and sampling of the Fall 1978 collection for the Nancy Ebker label; (h) notifying Marbrooke Corp. that Tan Jay would assume no responsibility in connection with the performance of the Marbrooke License Agreement and, indeed, would compete with Marbrooke in Canada in violation of the terms thereof; (i) preventing Nanco from performing its obligations under the Marbrooke contract; (j) continuing to use Ebker's designs, name and likeness in connection with the sale of Tan Jay's merchandise, without her participation, supervision, or approval; and (k) appropriating and using the method in connection with the planning and operation of Tan Jay's business operations, without Ebker's participation, supervision, or approval. (Complaint para. 14) Plaintiff seeks the equitable remedy of an accounting to remedy the alleged wrongs committed by defendants.

 The Court is permitted, when acting in its equitable capacity, to exercise discretion in determining whether or not on the facts presented at trial relief should be granted, and if so, the extent of the relief. See Standard Fashion Co. v. Siegel–Cooper Co., 157 N.Y. 60, 68, 51 N.E. 408, 410 (1898), later appeal, 44 A.D. 121, 60 N.Y.S. 739 (1st Dept., 1899). A distinguishing feature of equity is the application of settled rules to unusual conditions and the molding of its decrees so as to do equity between the parties. See Amsden v. Amsden, 202 Misc. 391, 393, 110 N.Y.S.2d 307, 309 (Sup.Ct. Monroe Co., 1952). The power of equity is as broad as equity and justice require. See Kaminsky v. Kahn, 23 A.D.2d 231, 237, 259 N.Y.S.2d 716, 723 (1st Dept., 1965); Kelly v. Chester Fire Dist.,

116 Misc.2d 334, 338, 455 N.Y.S.2d 312, 315 (Sup.Ct. Orange Co., 1982), *rev'd on other grounds*, 95 A.D.2d 799, 463 N.Y.S.2d 518 (2d Dept.), *aff'd* 60 N.Y.2d 660, 467 N.Y. S.2d 832, 455 N.E.2d 485 (1983).

Our Circuit Court has already determined that plaintiff is entitled to the equitable remedy of an accounting. *See Ebker v. Tan Jay International, Ltd.*, 739 F.2d 812, 828 (2d Cir.1984). The Court noted further:

> ... although Nygard has argued, both to the district court and to us that the only remedy available to Ebker as a joint venturer 'at will' is an accounting, *see* N.Y. Partnership Law § 74, the district judge never resolved the issue of what remedies Ebker might have and we think it best to defer ruling on the issue. We only note that the answer is far from clear, *compare Bassett v. American Meter Co.*, 20 A.D.2d 956, 249 N.Y.S.2d 815 (4th Dept., 1964) and *Hooker Chemicals & Plastics Corp. v. International Minerals & Chemical Corp.*, 90 A.D.2d 991, 456 N.Y.S.2d 587 (4th Dept., 1982) *with Crownshield Trading Corp. v. Earle*, 200 A.D. 10, 192 N.Y.S. 304 (1st Dept., 1922) *and LaFleur v. Montgomery*, 70 A.D.2d 545, 416 N.Y.S.2d 602 (1st Dept., 1979), and that even an accounting must make some ruling with respect to the ownership of the Nancy Ebker name.

*Ebker v. Tan Jay Inter., Ltd.*, 739 F.2d at 828.[7]

We therefore turn to a discussion of the cases cited hereinabove by our Circuit Court. In *Bassett*, the Court held that "the general rule of law that one partner cannot sue a copartner in an action at law on matters relating to the partnership until an accounting has been had and a balance struck does not relate to or preclude an action in equity seeking equitable relief by one partner against another." *Bassett v. American Meter Co.*, 20 A.D.2d 956, 957, 249 N.Y.S.2d 815, 816 (4th Dept., 1964). Although *Bassett* holds that an aggrieved copartner can seek equitable relief such as

an injunction, or the imposition of a constructive trust prior to the rendering of an accounting, in the case before us the sole remedy sought by plaintiff is an accounting, and therefore the *Bassett* case is inapplicable to the situation before us. Nor is *Hooker Chemicals*, a case in which a declaratory judgment was sought that the parties' joint venture was terminable at will, applicable to the instant case, since our Circuit Court expressly found that the agreement between Ebker and Nygard was terminable at will. *Ebker, supra*, 739 F.2d at 828.

The *Crownshield* and *LaFleur* cases cited by our Circuit Court are similarly inapplicable to the matter before us. *Crownshield* held that where a partner commences to dissolve a partnership before the end of the term agreed upon, or where prior to the commencement of the partnership or joint venture he disaffirms the underlying partnership contract, he is liable in an action at law for damages. *Crownshield Trading Corporation v. Earle*, 200 A.D. 10, 15, 192 N.Y.S. 304, 309 (1st Dept., 1922). Since the partnership between Ebker and Nygard was expressly held by the Court of Appeals to be terminable at will, the *Crownshield* case, which concerned a partnership which was for a fixed term, is not applicable to the matter before us.

*LaFleur v. Montgomery* recognized a cause of action for lost profits sustained by plaintiffs in consequence of defendant's alleged breach of contract in wrongfully terminating the joint venture. The Court held that "under such circumstances an action at law to recover for loss of profits may be maintained independent of seeking the equitable relief of an accounting." *LaFleur, supra*, 70 A.D.2d at 546, 416 N.Y.S.2d at 603–604. The joint venture in the *Lafleur* case also for a fixed period, and not terminable at will as was the partnership between Ebker and Nygard.

Our thorough examination of the four cases cited hereinabove for the proposition

---

7. In her post-trial papers plaintiff failed to address the cases cited by our Circuit Court on the issue of what additional remedies might be available to her, and requested only the eq-uitable relief of an accounting. (Plaintiff's Post–Trial Memorandum, dated January 15, 1988, pg. 68).

that Ebker might be entitled to relief above and beyond an accounting compels the conclusion that the sole remedy available to her as a partner at will is an accounting. Furthermore, plaintiff does not request any relief beyond an accounting, nor does she cite any case law to support the position that Ebker might be entitled to more than an accounting.

▮ The legal consequences of a joint venture are almost identical to those of a partnership, *see, Margate Industries, Inc. v. Samincorp, Inc.,* 582 F.Supp. 611, 620 (S.D.N.Y., 1984); *Pedersen v. Manitowoc Co.,* 25 N.Y.2d 412, 419, 306 N.Y.S.2d 903, 909, 255 N.E.2d 146, 151 (1969); *Napoli v. Domnitch,* 34 Misc.2d 237, 240, 226 N.Y. S.2d 908, 913 (Sup.Ct. Queens Co., 1962), *mod. on other grounds,* 18 A.D.2d 707, 236 N.Y.S.2d 549 (2d Dept., 1962), *aff'd,* 14 N.Y.2d 508, 248 N.Y.S.2d 228, 197 N.E.2d 623 (1964), and a joint venture is aptly reviewable and to be tested by rules substantially the same as partnership rules. *See Hanlon v. Melfi,* 102 Misc.2d 170, 173, 423 N.Y.S.2d 132 (Sup.Ct. Suffolk Co., 1979); *Glenmark v. Carity,* 30 Misc.2d 1065, 1069, 221 N.Y.S.2d 330 (Sup.Ct. N.Y., 1961); *Haxton v. Rich,* 267 A.D. 492, 495, 47 N.Y.S.2d 501 (3rd Dept., 1944); *Hooker Chemicals and Plastics Corp. v. International Minerals & Chemical Corp.,* 90 A.D.2d 991, 456 N.Y.S.2d 587 (4th Dept., 1982); *Hardin v. Robinson,* 178 A.D. 724, 725, 162 N.Y.S. 531 (1st Dept., 1916). Accordingly, our analysis of the relationship between Ebker and Nygard, who were joint venturers, is governed by the principles of partnership law.

*Termination of a partnership at will*

▮ A partnership at will may be dissolved at the will of either of the partners on a moment's notice without liability for breach of contract. *See Zimmerman v. Harding,* 227 U.S. 489, 492–494, 33 S.Ct. 387, 389, 57 L.Ed. 608 (1913); *Napoli v. Domnitch,* 18 A.D.2d 707, 708, 236 N.Y. S.2d 549, 552 (2d Dept., 1962), *aff'd* 14 N.Y.2d 508, 248 N.Y.S.2d 228, 197 N.E.2d 623 (1964); *Carola v. Grogan,* 102 A.D.2d 934, 935, 477 N.Y.S.2d 525, 527 (3rd Dept.,

1984); *Bayer v. Bayer,* 215 A.D. 454, 471, 214 N.Y.S. 322, 339 (1st Dept., 1926); N.Y. Partnership Law § 62, subd. 1(b) (McKinney 1988). The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business; dissolution occurs when a partner manifests an unequivocal election to dissolve the partnership. *See Carola v. Grogan, supra,* 102 A.D.2d at 935, 477 N.Y.S.2d at 527; *Glenmark v. Carity,* 30 Misc.2d 1065, 1069, 221 N.Y.S.2d 330, 334 (Sup.Ct. N.Y. Co., 1961); N.Y. Partnership Law § 60 (McKinney 1988). A partnership is not terminated upon dissolution, but continues until the winding up of partnership affairs is completed. *See* N.Y. Partnership Law § 61 (McKinney 1988); *Hamilton Co. v. Hamilton Tile Corp.,* 23 Misc.2d 589, 591, 197 N.Y.S.2d 384, 386 (Sup.Ct. N.Y. Co., 1960); *Kaydee Sales Corp. v. Feldman,* 14 Misc.2d 793, 796, 183 N.Y.S.2d 151, 155 (Sup.Ct. Monroe Co., 1958); *In re Luckenbach's Estate,* 45 Misc.2d 897, 898, 258 N.Y.S.2d 44, 46 (Surrogate's Ct. Nassau Co., 1965).

▮ "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty." *Meinhard v. Salmon,* 249 N.Y. 458, 463–464, 164 N.E. 545, 546 (1928); *see Hammond Oil Co. v. Standard Oil Co.,* 259 N.Y. 312, 322, 181 N.E. 583, 587 (1932); *Endries v. Paddock,* 241 A.D. 195, 197, 271 N.Y.S. 848, 850 (3d Dept., 1934), *aff'd* 267 N.Y. 526, 196 N.E. 562 (1935); *Madison Pictures Inc. v. Pictorial Films, Inc.,* 6 Misc.2d 302, 311, 151 N.Y.S.2d 95, 109 (Sup.Ct. N.Y. Co., 1956); *In re Arnay's Estate,* 18 Misc.2d 266, 267, 187 N.Y.S.2d 782, 786–787 (Surrogate's Ct. N.Y. Co., 1959). Strict adherence to the rule of undivided loyalty has been insisted upon by the Courts without exception. *See Knapp v. First National Bank & Trust Co.,* 154 F.2d 395, 398 (10th Cir., 1946); *Boxill v. Boxill,* 201 Misc. 386, 389, 111 N.Y.S.2d 33, 36 (Sup.Ct. N.Y. Co.1952); *In re Kohn's Estate,* 26 Misc.2d 659, 663, 116 N.Y.S.2d 167, 172 (Surrogate's Court, N.Y.Co.1952),

*aff'd*, 282 A.D. 1045, 126 N.Y.S.2d 897 (1st Dept., 1953).

"The fact that the partnership is one terminable at the will of either party does not diminish a partner's duty to his associate as long as the partnership in fact exists." *Boxill v. Boxill, supra,* 201 Misc. at 389, 111 N.Y.S.2d at 36. *See Mitchell v. Read,* 61 N.Y. 123, 136 (1874). However, the fiduciary relation between partners terminates upon notice of dissolution, even though the partnership affairs have not been wound up. *See Gilmore v. Ham,* 142 N.Y. 1, 7, 36 N.E. 826, 828 (1894); *Matter of Silverberg,* 81 A.D.2d 640, 641, 438 N.Y.S.2d 143, 144 (2d Dept., 1981); *Ben Dashan v. Plitt,* 58 A.D.2d 244, 249, 396 N.Y.S.2d 542, 546 (4th Dept., 1977); *Stark v. Utica Screw Products Inc.,* 103 Misc.2d 163, 165, 425 N.Y.S.2d 750, 752 (Utica City Ct., 1980). Although a partner's duties to his coparters may be relaxed in a relationship that looks to the future of a newly dissolved partnership, a partner's duty of good faith and full disclosure continues as to dealings affecting the winding up of the partnership and the proper preservation of partnership assets during that period. *Lavin v. Ehrlich,* 80 Misc.2d 247, 249, 363 N.Y.S.2d 50, 52 (Sup.Ct. Nassau Co., 1974); *Hamilton Co. v. Hamilton Tile Corp.,* 23 Misc.2d 589, 591, 197 N.Y.S.2d 384, 386 (Sup.Ct. N.Y. Co., 1960). Any partner normally has the right to participate in the winding up process and the duty imposed upon this liquidating partner is one of agency. *Ben–Dashan v. Plitt,* 58 A.D.2d 244, 249, 396 N.Y.S.2d 542, 546 (4th Dept., 1977).

The joint venture between Nygard and Ebker, which by the law of the case was terminable at will, *see Ebker v. Tan Jay, supra,* 739 F.2d at 828, was effectively dissolved on February 14, 1978, when Nygard announced to Ebker that she was "fired." As a partner at will, Nygard had the right to terminate the joint venture, and his termination of the partnership was not legally actionable. While the partnership continued, Nygard owed Ebker a fiduciary duty of the utmost good faith. Once Nygard elected to terminate the venture, and the winding down process began, his fiduciary duty to Ebker terminated. Nevertheless, Nygard still owed Ebker the duty to act in good faith in winding down the partnership affairs, and could not conduct the winding down process so as to cause loss to Ebker or the assets of the partnership. Any conduct by Nygard which was in breach of his duty of good faith to Ebker would be taken into consideration in an accounting, and Nygard would be liable for any damage which he caused Ebker as a result of his breach.

Plaintiff, in her post-trial memorandum, misstates the duty owed by Nygard to Ebker. Plaintiff argues that Nygard owed her a fiduciary duty of the "utmost good faith" in winding down the affairs of the partnership. This contention is not in accord with the law. Prior to the termination of the venture Nygard did indeed owe to Ebker a fiduciary duty of the utmost good faith, but subsequent to his election to terminate the venture, his fiduciary duty terminated and the duty owed Nygard became that of agency, to act in good faith in winding down the affairs of the venture. Although plaintiff criticizes the manner in which Nygard conducted himself during the lifetime of the joint venture, she does not assert that it was this conduct which amounted to a breach of Nygard's fiduciary duty to Ebker, nor does our review of the record in this case substantiate a breach of fiduciary duty on the part of Nygard.

We do, however, find that Nygard breached his duty of good faith to Ebker in the manner in which he wound down the affairs of the partnership. Although Nygard claimed that he wanted to terminate the partnership in an amicable manner, and that both Ebker and Nygard discussed the orderly dissolution of their venture, these assertions were completely refuted by the actions of Nygard subsequent to his firing of Ebker. Nygard confiscated the keys to plaintiff's office at 1411 Broadway showroom, changed the locks at the 37th Street warehouse, a premises which was leased in Ebker's name, posted guards at the 1411 Broadway showroom, cancelled goods ordered by Ebker during the course of the venture for her fall "Nancy Ebker" line, informed her suppliers that Ebker had no

**470**

authority to make these purchases, disseminated information to Ebker's "Nancy Ebker" customers that Ebker had made it impossible for Tan Jay to complete the orders for the Nancy Ebker line, confiscated all of the contents of the 37th Street warehouse, continued to ship the "Nancy Ebker" line in a haphazard fashion and shipped "Nancy Ebker" merchandise to customers after removing the labels, and finally appropriated for his own use all of the contents of the 37th Street warehouse and 1411 Broadway showroom, and effectively made it impossible for Ebker to salvage her "Nancy Ebker" line upon the venture's termination. Nygard must be called to account for this conduct, to the extent that plaintiff was damaged by his actions.

### Plaintiff's right to an accounting

 Under New York law, the only manner in which a partnership or joint venture can be wound up is through an accounting, N.Y. Partnership Law §§ 44, 74 (McKinney 1988); see Margate Industries Inc. v. Samincorp, Inc., 582 F.Supp. 611, 620 (S.D.N.Y., 1984); Shandell v. Katz, 95 A.D.2d 742, 743, 464 N.Y.S.2d 177, 179 (1st Dept., 1983), later appeal, 112 A.D.2d 102, 491 N.Y.S.2d 658 (1985); Ben–Dashan v. Plitt, 58 A.D.2d 244, 249, 396 N.Y.S.2d 542, 546 (4th Dept., 1977); Toeg v. Margolies, 280 A.D. 319, 321, 113 N.Y.S.2d 373, 375 (1st Dept., 1952), appeal dismissed, 305 N.Y. 568, 111 N.E.2d 442 (1953); Hamilton Co. v. Hamilton Tile Corp, 23 Misc.2d 589, 591, 197 N.Y.S.2d 384, 386 (Sup.Ct. N.Y. Co., 1960); In re Luckenbach's Estate, 45 Misc.2d 897, 898, 258 N.Y.S.2d 44, 46 (Surrogate's Ct. Nassau Co., 1965); Stark v. Utica Screw Products Inc., 103 Misc.2d 163, 165, 425 N.Y.S.2d 750, 752 (Utica City Ct., 1980), wherein its overall financial status may be evaluated. "It is well settled that one partner cannot sue the other at law, as distinguished from an action in equity, with respect to partnership transactions, except after a full accounting, and balance struck, and such an action is on contract and not ex delicto." Pace v. Perk, 81 A.D.2d 444, 453, 440 N.Y.S.2d 710, 715 (2d Dept., 1981); Consolidated Machinery & Wrecking Co. v. Harper Machinery Co., 190 A.D. 283, 286, 180 N.Y.S. 135, 136 (1st

Dept., 1920); Dalury v. Rezinas, 183 A.D. 456, 460, 170 N.Y.S. 1045, 1049 (1st Dept., 1918); Friedland v. Friedland, 12 Misc.2d 349, 350, 175 N.Y.S.2d 264, 266 (Sup.Ct. Kings Co., 1958); Coleman v. Purtell, 115 N.Y.S.2d 712, 714 (Sup.Ct. Oswego Co., 1951). "If one partner betrays his trust, and converts to his own use partnership property, he incurs the usual liability that one partner incurs to another respecting partnership affairs, i.e. to be held liable in an accounting, but he cannot be sued by the other partner for damages in an action for conversion." See Pace v. Perk, 81 A.D.2d 444, 452, 440 N.Y.S.2d 710, 715 (2d Dept., 1981).

"[T]he only manner in which indefensible appropriation can be punished is by an accounting in which the respective rights of each party can be determined, and the wrongdoer brought to justice." Silfen v. Simon, 33 Misc.2d 13, 215 N.Y.S.2d 571, 573 (Sup.Ct. N.Y. Co., 1961). A partner can be called to account for any breach of duty to his copartner that deprived him of his interests in the copartnership assets. Dalury v. Rezinas, 183 A.D. 456, 460, 170 N.Y.S. 1045, 1049 (1st Dept., 1918), aff'd, 229 N.Y. 513, 129 N.E. 896 (1920).

### What items are considered in an accounting?

Plaintiff argues that an accounting is more than a profit and loss statement, and that an accounting must consider the value of the assets which each partner brought to the partnership. Glaringly absent from plaintiff's post-trial memorandum is any case law in support this position. (Plaintiff's Post-trial Memorandum of Law, 67–72) This omission is particularly offensive to the Court since it is the very crux of plaintiff's claim—that an accounting is not a mere profit and loss statement, but an evaluation of the overall actions of the parties during the course of the venture.

 Despite the fact that we deplore the unseemly conduct of Nygard, both during the lifetime of the joint venture, and in the winding up period, we nevertheless find that plaintiff has failed to persuade us by a fair preponderance of the credible evidence that she was damaged by the actions of Nygard. We bear in mind when we reach

this conclusion that the venture between the parties was terminable at the will of either party, without liability for such termination. Moreover, although plaintiff alleges that she brought valuable assets to the partnership, she has failed to provide us with any legal authority in support of her position that the assets which she contributed to the joint venture should be considered in an accounting. Furthermore, although plaintiff has established that Nygard acted in bad faith in the manner in which he wound down the partnership, plaintiff has not in any respects established that she was damaged as a result of such conduct. Indeed, this conclusion is bolstered if we consider the assets which plaintiff claims that she contributed to the joint venture. The first asset which plaintiff maintains that she contributed to the joint venture is the Nancy Ebker name. Plaintiff retained her name following the dissolution of the joint venture, and the testimony at trial establishes that her name was not used by Nygard or Tan Jay following the spring of 1978. Moreover, plaintiff failed to prove that she was damaged by Tan Jay's use of her name following the termination of the venture. The second asset which Ebker brought to the venture, namely her reputation and expertise in the industry, remained with her following the termination of the venture. Indeed, plaintiff's expert Bill Sothern testified that following the dissolution of the joint venture, Ebker accepted employment with Charlotte Ford, Inc., where she designed an extremely successful line of blue jeans. (Tr. 453) Furthermore, the testimony at trial established that within three months after Nygard "fired" Ebker, all but one member of her management team, (another asset which Ebker maintains she contributed to the venture), had left Nygard's employ. The remaining assets, namely the "Vivo" and "Sportwork–Nancy Ebker" going concerns, the lease on the 1411 showroom and the Chicago showroom, and the five hundred patterns, were all purchased by Tan Jay for a sum of $67,000. These remaining assets which were sold to Tan Jay were owned by Genesco, not Ebker. Therefore her claim that she contributed these assets to the partnership is not supported by the evidence. Although it appears that Ebker

was indeed instrumental in securing Genesco's approval of the sale of the assets to Tan Jay, we nevertheless conclude that it was Genesco's property, not Ebker's, which Tan Jay purchased.

■ While we find that Ebker has not established to our satisfaction that she is entitled to damages from Nygard, we also note that defendants have not established that they are entitled to recover half of the losses of the joint venture.

The usual manner in which partnership property is to be disposed of following the termination of a partnership is clearly set forth in section 69 of the N.Y. Partnership Law (McKinney 1988). Section 69 provides, in pertinent part, as follows:

*Rights of partners to application of partnership property*

1) When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his copartners and all persons claiming through them in respect of their interest in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners....

However, in the case before us, the parties agreed that Nygard would fund the joint venture until the "break-even" point, which was to occur approximately nine months after the inception of the joint venture. Until such point, the parties agreed that Nygard was to bear all of the losses of the venture. Following the "break-even" point, the parties agreed that they would share both the losses and the profits. (Tr. 139) Since this venture was terminated by Nygard well before the projected "break-even" point, it never showed a profit. Under the terms of Nygard and Ebker's agreement, an agreement which Nygard had the opportunity to dispute at trial but did not do so, Nygard is solely liable for the losses sustained by the joint venture.

## PUNITIVE DAMAGES

■ Plaintiff also seeks to recover punitive damages against Nygard. Punitive or exemplary damages have been al-

lowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future. *Walker v. Sheldon*, 10 N.Y.2d 401, 179 N.E.2d 497, 223 N.Y.S.2d 488 (1961) (fraud action). It is not the form of the action that gives the right to the jury to give punitive damages, but the moral culpability of a defendant. *Hamilton v. Third Ave. Railroad Co.*, 53 N.Y. 25 (1873). In order to justify an award of punitive damages there must be a showing of actual injury which would justify an award of actual or compensatory damages. *See Gill v. Montgomery Ward & Co.*, 284 A.D. 36, 41, 129 N.Y.S.2d 288, 295 (3rd Dept., 1954). Moreover, punitive damages generally are not recoverable where the alleged wrong was a private wrong as opposed to one aimed at the public generally. *H & R Hats & Novelties, Inc. v. Citibank, N.A.*, 102 A.D.2d 742, 477 N.Y.S.2d 9, 10 (1st Dept., 1984), *later appeal*, 104 A.D.2d 775, 481 N.Y.S.2d 310 (1st Dept., 1984).

▇ We find that plaintiff is not entitled to punitive damages under the circumstances of this case. Although, as we stated above, we deplore the conduct of Nygard, we nevertheless find that plaintiff has failed to establish that she was damaged by such conduct, and accordingly, an award of punitive damages, which requires actual injury, cannot be sustained.

### DEFENDANT'S COUNTERCLAIMS

Defendant Tan Jay asserts the following counterclaims against Ebker: (1) breach of a bailment contract, (2) conversion, (3) tortious interference with Tan Jay's contract, and (4) tortious interference with defendant Tan Jay's prospective advantage. In addition, defendant Tan Jay seeks to impose punitive damages against Ebker for her allegedly intentional and malicious sealing of the doors of the 37th Street warehouse.

Our finding that Tan Jay sustained no damage as a result of the February 28, 1978 lockout, and that any losses occasioned by Tan Jay were solely the result of the conduct of Nygard and his staff in haphazardly shipping the "Nancy Ebker"

and "Bianca" merchandise, compels us to dismiss the counterclaims of Tan Jay, all of which are predicated on damages sustained by Tan Jay as a result of the February 28, 1978 lockout. Accordingly, since defendants sustained no actual injury as a result of the conduct of plaintiff, we are also constrained to dismiss Tan Jay's claim for punitive damages against Ebker.

### CONCLUSION

In sum, we hold as follows:

Plaintiff's complaint is dismissed in its entirety. The counterclaims of defendant Tan Jay are dismissed in their entireties. Each party will bear its own costs of this action.

SO ORDERED.