**ORDERLINE WHOLESALE DISTRIBUTORS, INC. and Elliot I. Fine, Plaintiffs,**

v.

**GIBBONS, GREEN, van AMERONGEN, LTD., Taylor Freezer Co., and Daniel Greenwood, individually and as President of Taylor Freezer Co., Defendants.**

**No. 85 Civ. 4973 (MGC).**

United States District Court, S.D. New York.

Dec. 14, 1987.

---

Reboul, MacMurray, Hewitt, Maynard & Kristol by Wayne A. Cross, New York City, for plaintiffs.

Kramer, Levin, Nessen, Kamin & Frankel by Michael S. Oberman, Fred H. Perkins, New York City, for defendant GGvA.

## OPINION

CEDARBAUM, District Judge.

This action was commenced on June 27, 1985. The plaintiffs are Orderline Wholesale Distributors, Inc., ("Orderline"), an Ohio corporation, with its principal place of business in Maumee, Ohio, and Orderline's vice-president, director, and 50% shareholder Elliot I. Fine, also a resident of Ohio. Plaintiffs sued Gibbons, Green, van Amerongen, Ltd., ("GGvA"), a New York corporation with its principal place of business in New York, Taylor Freezer Co., ("Taylor"), a Delaware corporation with its principal place of business in Illinois, and Daniel Greenwood, a resident of Illinois. This is a diversity case in which the parties agree that New York law applies. Discovery has been completed.

The complaint alleges that plaintiffs entered into an enforceable oral agreement with GGvA to participate in the acquisition of certain food service equipment companies, and that GGvA breached this agreement. Plaintiffs assert claims for breach of contract, together with companion claims of *quantum meruit*, breach of fiduciary duty, fraudulent inducement and constructive fraud. GGvA has moved for summary judgment pursuant to Fed.R. Civ.P. 56 on the ground that plaintiffs cannot make a showing sufficient to establish the existence of all elements essential to each of their claims against GGvA. For the reasons discussed below, GGvA's motion for summary judgment is granted.

## UNDISPUTED FACTS

Orderline is engaged in the business of purchasing and reselling food service equipment acquired from various sources. For a time, Orderline purchased and leased Taylor equipment to small food stores and restaurants. Fine was involved in the leas-

ing of Taylor equipment and had on-going contacts with Taylor and some of its distributors. (Fine Dep. 9–10).

In July 1984, plaintiffs learned that Beatrice Cos. ("Beatrice") intended to sell five companies engaged in the manufacture of food service equipment. (Fine Dep. 109). Those companies were Bloomfield Industries, Market Forge Co., Wells Manufacturing Co., World Dryer Corp., and Taylor Freezer Co., (collectively, "the five companies").

Upon learning of the intended sale, Fine called Richard Vitkus, Beatrice's vice-president and general counsel, to inquire about the planned sale of Taylor. Fine learned that Taylor would be sold only as part of a package of the five companies. (Fine Dep. 127).

On July 24, 1984, Beatrice publicly announced its plan to sell the five companies. A report of Beatrice's announcement appeared in *The Wall Street Journal* and *The New York Times* on July 25, 1984, but the names of the individual companies were omitted. To assist in finding purchasers for the five companies, Beatrice retained Salomon Brothers ("Salomon") and Lazard Freres & Co. ("Lazard"), which planned and implemented a bidding procedure.

Fine began to contact various people whom he believed might be interested in the five companies, and who might have the means and expertise to put a deal together for the purchase of the companies. (Fine Dep. 129). Fine, who had had no previous contact with GGvA, learned of GGvA from an article that appeared in late July in the Midwest Edition of *The Wall Street Journal*, reporting on GGvA's role in the acquisition of Ekco Housewares. After reading the article, Fine decided to call GGvA. (Fine Dep. 149).

GGvA was then a New York corporation that had specialized in leveraged and management buyouts since 1969. Sometime after this action was commenced, the corporation was liquidated, and its activities were continued as a New York partnership.

On July 30, 1984, Fine telephoned the office of GGvA, and asked to speak to the person who handled acquisitions. (Fine Dep. 158–59). His call was referred to Todd Goodwin. (Fine Dep. 160–61). In this telephone conversation and possibly another telephone call made the following day, Fine told Goodwin about Orderline, his experience with Taylor and the food service equipment industry, the availability of the five companies, and the name of Richard Vitkus as the Beatrice officer in charge of the sale. (Fine Dep. 169–77). Fine relayed to Goodwin his understanding that GGvA did acquisitions of this sort, and expressed his interest in participating with GGvA in the acquisition of the five companies. (Fine Dep. 177). Fine's hope was to establish an acquiring corporation to purchase all five companies, and eventually to spin off Taylor to the plaintiffs. (Fine Dep. 135–36).

Prior to these telephone conversations, neither Goodwin nor anyone else at GGvA had considered a possible acquisition of the five companies, nor had GGvA had any experience with similar deals in the food service equipment industry. Goodwin confirmed that the proposed acquisition sounded like the kind of deal that GGvA would be interested in. (Fine Dep. 173, 177).

Goodwin proceeded to call Vitkus on July 31 and was advised that Salomon and Lazard represented Beatrice. (Goodwin Dep. 21–22). Goodwin entered into a confidentiality agreement with Salomon on September 10, and received an overview of the five companies prepared by Salomon and Lazard. (Pl. Ex. 2). GGvA was not authorized to show this report to Fine, and did not do so. (Goodwin Dep. 37–38).

Goodwin met with Beatrice at Salomon's Chicago office on September 19, and thereafter requested and received financial information for GGvA. (Pl. Ex. 6). In mid-October, Goodwin visited three of the five companies and met with their top management. (Pl. Ex. 6).

Following the initial telephone calls, and over the course of the next three months, Fine and Goodwin spoke by telephone at least ten times regarding the sale of the five companies. (Fine Dep. 187). During

this period there was no written correspondence between the parties, no exchange of any written material, and no face-to-face meeting between any representatives of Orderline and GGvA. (Fine Dep. 185–187).

After the early conversations, Fine believed that GGvA was committed to him and Orderline, but that they were not committed to GGvA. (Fine Dep. 213).

Until October 5, 1984, Fine believed that he was free to deal with anyone else he wanted, and this was confirmed by Goodwin. Fine even told Goodwin that he was working with someone else. (Fine Dep. 213). By October 5, when Fine decided that he wanted to participate with GGvA, his other potential investors had withdrawn and GGvA was his only possible investment opportunity. (Fine Dep. 327–28).

On October 9, Goodwin met with Greenwood, who was then President of Taylor. In a memorandum written shortly after this October 9 meeting, Goodwin noted the following:

Fine has no relationship with Taylor or its distributors. Greenwood considers him a pleasant man but a "con artist" who does not represent the Taylor distributors. Fine has been in touch with Greenwood as well as TG [Goodwin]. Greenwood has no interest in Fine becoming involved in any way and suggests that he has no significant ability to invest. I explained that we had never met; that we have no commitment to Fine; that we operate as principals; and that we have told Fine to find an investment banker if he wants to make an independent proposal.

(Pl. Ex. 6).

Goodwin telephoned Fine shortly after this October 9 meeting with Greenwood to advise Fine that he would not be invited to participate in the transaction with GGvA. (Goodwin Dep. 26, 31).

On behalf of Beatrice, Salomon issued a request for bids on October 22, 1984, with a November 2, 1984 bid deadline. At that point, Salomon and Lazard had contact with approximately 115 prospective bidders. In the end, five bids were received and GGvA's bid of more than $115 million

prevailed. A negotiated letter of intent was executed on November 14, 1984, and a public announcement was made on November 28, 1984. The transaction closed on January 30, 1985. (Pl.Ex. 7, Goodwin Dep. 95).

The central issue in this case is whether at some point during the telephone conversations between Fine and Goodwin they made an enforceable oral agreement to proceed together in purchasing the five companies.

Plaintiffs allege that GGvA orally entered into an enforceable joint venture or partnership agreement with one or both of them to acquire the five companies being sold by Beatrice, with plaintiffs and GGvA respectively to contribute and then to own 10% and 90% of the equity of the acquiring corporation. They further allege that it was part of this agreement that the acquiring corporation would ultimately spin off Taylor to plaintiffs. It is plaintiffs' contention that once GGvA had received all of Fine's information regarding the acquisition opportunity and the food service equipment industry, and no longer needed Fine and Orderline, GGvA refused to permit plaintiffs to continue to participate in the acquisition. Plaintiffs have also made claims for damages on the basis of *quantum meruit*, breach of fiduciary duty, fraudulent inducement and constructive fraud.

Defendant GGvA argues that the undisputed material facts show that no agreement was reached with plaintiffs, and that GGvA has not violated any duty to plaintiffs.

## DISCUSSION

Fed.R.Civ.P. 56(c) provides that "a court shall grant a motion for summary judgment if it determines that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The essential question on a motion for summary judgment is

whether there is a genuine dispute about a material fact. This standard is closely related to the test for a directed verdict. If the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party opposing the motion for summary judgment is entitled to have the record viewed in the light most favorable to him, with all reasonable inferences drawn, and any doubts and ambiguities resolved, in his favor. *See, e.g., Patrick v. LeFevre*, 745 F.2d 153 (2d Cir.1984). However, if, after adequate time for discovery, the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, summary judgment may properly be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no "genuine issue as to any material fact," since a failure of proof on an essential element of the case of the nonmoving party "necessarily renders all other facts immaterial." *Id.* 106 S.Ct. at 2553.

### 1. Breach of Express Contract

Plaintiff's first claim for relief is that GGvA "breached an express contract with plaintiffs when [GGvA] refused to allow plaintiffs to participate in the acquisition of the five food service equipment companies as a participant in the partnership or joint venture they had formed." Amended Complaint ¶ 24.

Although the complaint alleges the existence of either a joint venture or a partnership, the parties have focused their attention on whether there was a joint venture agreement. They apparently recognize that the relevant indicia of a partnership are substantially the same as those of a joint venture, *see Tenney v. Insurance Co. of North America*, 409 F.Supp. 746, 749 (S.D.N.Y.1975), and that, as a general rule, joint ventures are thought of in relation to specific ventures or undertakings, whereas partnerships are more general in operation or duration. *See Yonofsky v. Wernick*, 362 F.Supp. 1005, 1031 (S.D.N.Y.1973). Accordingly, while this discussion focuses on whether the parties entered into a joint venture, the reasoning and conclusions are also applicable to plaintiffs' claim that the parties formed a partnership.

Under New York law, a joint venture requires each of the following elements:

1. There must be a specific agreement manifesting the intent of the parties to be associated as joint venturers;

2. each party must make a contribution of property, financial resources, effort, skill or knowledge;

3. there must be a provision for the sharing of profits and losses; and

4. the parties must have some degree of joint control and joint management over the enterprise. *Chromalloy American Corp. v. Universal Housing Systems, Inc.*, 495 F.Supp. 544, 549 (S.D.N.Y.1980), *aff'd*, 697 F.2d 289 (2d Cir.1982); *Flammia v. Mite Corp.*, 401 F.Supp. 1121, 1126–27 (E.D.N.Y.1975), *aff'd*, 553 F.2d 93 (2d Cir. 1977); *Precision Testing Laboratories, Ltd. v. Kenyon Corp.*, 644 F.Supp. 1327, 1348 (S.D.N.Y.1986); *McGhan v. Ebersol*, 608 F.Supp. 277, 282 (S.D.N.Y.1985); *Yonofsky v. Wernick*, 362 F.Supp. 1005, 1030–32 (S.D.N.Y.1973).

The absence of even one of these elements is fatal to the establishment of a joint venture. *Precision Testing Laboratories v. Kenyon Corp.*, 644 F.Supp. at 1348.

■ In support of their position that there is a genuine issue of material fact as to the first element, the existence of an agreement to be associated as joint venturers, plaintiffs offer Fine's deposition testimony that in the telephone calls between Fine and Goodwin the parties orally agreed to act together to acquire the five companies. According to Fine, the terms of the agreement were for plaintiffs and GGvA to purchase and own, respectively, 10% and 90% of the equity of the acquiring corporation, and that within three to four years after the acquisition, Taylor would be spun

off to the plaintiffs. Although the agreement can hardly be characterized as detailed, Fine's testimony raises a genuine issue of material fact with respect to the intent of the parties to be associated as joint venturers.

As to the second element, a contribution by each party, it is undisputed that Fine provided GGvA with the name of Richard Vitkus, the contact at Beatrice, and with information regarding the food service equipment industry in general and the five companies in particular.

With respect to the third element, a provision for the sharing of profits and losses, Fine testified at his deposition that it was his understanding that profits and losses alike would be allocated according to the amount of each parties' investment. Therefore, Fine believed that 10% of the losses as well as 10% of the profits would be allocated to him and 90% of profits and losses would be allocated to GGvA. (Fine Dep. 272).

I turn then to the final essential element of a joint venture—the requirement that the parties have some degree of joint control and joint management over the enterprise. Plaintiffs' account of the circumstances surrounding the alleged joint venture provides no evidence of either joint control or joint management, or of any expectation of joint control or joint management. On the contrary, Fine's own deposition testimony shows that each party was proceeding independently. While Goodwin was contacting Vitkus and Salomon to learn the details of the proposed sale, (Goodwin Dep. 22–23), and Goodwin, without telling Fine, was attending a distributor's meeting to learn about the industry, (Goodwin Dep. 192, 200), Fine was pursuing other entities whom he also hoped to interest in submitting a bid for the acquisition of the five companies. Furthermore, although Fine guarded the identity of his other contacts, he told Goodwin that he was continuing his search for a deal with others. (Fine Dep. 329–30). In addition, GGvA alone was responsible for negotiating the terms of the acquisition agreement with Beatrice, for setting the bid price, for

determining what part of the bid would be funded by debt and what part by equity, for deciding on the management of the five companies if the bid were successful, and for deciding when Taylor would be spun off. (Fine Dep. 251–53, 284).

What emerges from plaintiffs' version of the facts is that GGvA was structuring an acquisition, and that Fine's role in GGvA's acquisition was that of a passive investor, not a partner. GGvA told Fine the rules. (Fine Dep. 284). There is no evidence that Fine exercised any control or management over GGvA's venture of acquiring the five food service equipment companies.

Since the requisite element of joint control and joint management was never addressed by the alleged co-venturers, it cannot reasonably be satisfied. *See Precision Testing Laboratories Ltd. v. Kenyon Corp.*, 644 F.Supp. at 1349–50 (failure to discuss issues of control and management of the ultimate entity the joint venturers were to co-own, and failure to determine who would be the company's officers and directors, leaves the element of joint control and joint management unsatisfied); *McGhan v. Ebersol*, 608 F.Supp. at 284 (inability to operate outside of alleged joint venturer's direction and control establishes that the element of joint control and management was unsatisfied).

The absence of any proof of this essential element of plaintiffs' joint venture contract claim defeats that claim as a matter of law.

### 2. Quantum Meruit

Plaintiffs' second claim for relief alleges that GGvA breached a contract implied in law by appropriating the benefits of plaintiffs' plan together with plaintiffs' knowledge of the food service equipment industry. As a result, plaintiffs maintain that GGvA is liable to them in *quantum meruit.*

In support of this position, plaintiffs rely on *Prudential Oil Corp. v. Phillips Petroleum Co.*, 418 F.Supp. 258 (S.D.N.Y.), *rev'd on other grounds*, 546 F.2d 469 (2d Cir. 1976). In *Prudential*, plaintiff developed an idea for the establishment of a petro-

chemical core facility. Defendant used plaintiff's novel concept without compensating plaintiff. The court found that no joint venture had been agreed to, but held that defendant was liable to plaintiff in *quantum meruit* for the value of what had been used.

■ It was essential to the holding in *Prudential* that the plaintiff's idea was novel. In this case, Fine's proposal was not novel. More than 100 groups were working toward a bid on the five companies. The availability of the five companies was published in *The Wall Street Journal* and *The New York Times*. An idea that is not novel is not protectible as property under New York law. *See Murray v. National Broadcasting Company, Inc.*, 671 F.Supp. 236 (S.D.N.Y.1987). Furthermore, Fine's knowledge of the food service equipment industry and information about Taylor were volunteered without any reasonable expectation of compensation.

■ Nor can plaintiffs recover in *quantum meruit* on the ground that they are entitled to compensation for the information provided to GGvA with respect to its acquisition of the five companies. N.Y. Gen.Oblig.Law § 5–701(a)(10) provides that such an implied contract is "void" unless in writing and signed by the party to be charged:

> [a] contract to pay compensation for services rendered in negotiating ... a business opportunity, business, its good will, inventory, fixtures, or an interest therein, including the majority of the voting stock interest in the corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation....

*Id.*

In *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 401 N.Y.S.2d 176, 372 N.E.2d 12 (1977), the New York Court of Appeals held that "negotiating a business opportunity" within the meaning of

§ 5–701(a)(10) includes the use of "connections," "ability" and "knowledge" to facilitate or assist in the transaction by helping the acquirer of the business opportunity meet the right people and have the right information. The court noted that "[b]ecause in some circumstances the important services of an intermediary may be accomplished in the course of a few and even momentary conversations, false or exaggerated claims can be easily asserted. It is this type of situation to which the statute [§ 5–701(a)(10) ] is addressed." *Id.*

The supplying of information by Fine to GGvA is the type of intermediary service which falls within the ambit of § 5–701(a)(10). The requirement of a writing cannot be circumvented by an action for compensation in *quantum meruit*. *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 571, 297 N.Y.S.2d 947, 950, 245 N.E.2d 712, 713 (1969); *Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 277 N.Y. S.2d 268, 223 N.E.2d 793 (1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967). Thus, plaintiffs' claim seeking relief in *quantum meruit* cannot succeed.

### 3. Breach of Fiduciary Duty

■ Plaintiffs' third claim for relief is based on the premise that plaintiffs and GGvA were partners or coventurers with respect to the acquisition of the five companies. Plaintiffs assert that GGvA breached its fiduciary duty to them by misappropriating their business opportunity.

Since, as discussed above, plaintiffs fail to make a showing sufficient to establish the existence of an enforceable joint venture or partnership agreement with GGvA, they also fail to make a showing sufficient to establish the existence of a fiduciary obligation to them by GGvA—an element essential to their third claim for relief.

### 4. Fraudulent Inducement

Under New York law, the essential elements of a fraud claim are: (1) that defendant made a representation as to a material fact, (2) which was false, (3) and known to be false by the defendant, (4) and that the

representation was made for the purpose of inducing the other party to rely upon it, (5) and that the other party justifiably did so rely upon the representation, (6) to his detriment. *Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d 186 (2d Dept. 1980).

In this case, plaintiffs allege that GGvA represented that it intended to acquire the five companies with plaintiffs; that this statement was false, and known by GGvA to be false when made; that the representation was fraudulently made to induce plaintiffs not to compete against GGvA in bidding independently for the acquisition of the five companies; and that plaintiffs did detrimentally rely on the representation and did not seek to organize another potential bidder group. The injury claimed is loss of the opportunity to pursue the deal with other investors.

Plaintiffs' complaint pleads the essential elements of an action for fraud as distinct from an action for breach of contract. *Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 295 (2d Cir.1986); *Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958).

Since this is a claim alleging fraud, each essential element must be proved by the plaintiffs by clear and convincing evidence. *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 10, 330 N.Y.S.2d 33, 39, 280 N.E.2d 867, 871 (1972); *Orbit Holding Corp. v. Anthony Hotel Corp.*, 121 A.D.2d 311, 314, 503 N.Y.S.2d 780, 782 (1st Dept. 1986). The question on summary judgment is whether the evidence in the record is sufficient both in quantity and quality to justify submission of the claim of fraud to a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> [I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden ... The question here is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not.

*Id.* 477 U.S. at ——, 106 S.Ct. at 2513, 91 L.Ed.2d at 215.

■ Taking the facts as offered by plaintiffs, and drawing all inferences in plaintiffs' favor, there is insufficient evidence of at least two elements essential to plaintiffs' fraud claim—(1) that plaintiffs detrimentally relied on GGvA's representation that it intended to proceed with plaintiffs, and (2) that GGvA did not intend to perform at the time the alleged representation to the contrary was made.

There are no facts in the record from which it could be inferred that plaintiffs detrimentally relied on a representation made by GGvA. First, it is undisputed that prior to his conversation with Greenwood, Goodwin encouraged Fine to pursue other investors. (Fine Dep. 213). It is also clear that Fine, prior to October 5, 1984, had been pursuing other investors. (Fine Dep. 213). Fine also believed that he was not yet committed to GGvA. (Fine Dep. 213). When Fine determined to go forward with GGvA, it was only after alternative investment opportunities had disappeared. (Fine Dep. 327–28). Thus, plaintiffs' own version of the facts shows that GGvA did not induce plaintiffs to forgo submitting a competing bid for the five companies, but on the contrary, GGvA encouraged them to do so. Furthermore, plaintiffs did not forgo the opportunity to pursue the acquisition with other investors, but instead affirmatively sought, albeit unsuccessfully, to organize an independent investor group to submit a bid for the acquisition of the five companies. There is no evidence of any detrimental reliance on plaintiffs' part since Fine had fully pursued and exhausted the possibilities available to him for organizing a competing group before Goodwin told him that GGvA would not include plaintiffs in the deal.

As to plaintiffs' claim that GGvA entered into the alleged agreement with the intent not to perform, the only evidence offered is the fact that in the end GGvA did not include them in the acquisition. Where the

**130**

only proof is that the defendant failed to keep his promise, it is insufficient to establish that the defendant did not intend to perform at the time the promise was made. *Lanzi v. Brooks,* 54 A.D.2d 1057, 1058, 388 N.Y.S.2d 946 (3rd Dept.1976), *aff'd,* 43 N.Y. 2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977). "Fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance." *Brown v. Lockwood,* 76 A.D.2d at 733, 432 N.Y.S.2d 186, citing *Adams v. Clark,* 239 N.Y. 403, 146 N.E. 642 (1925). *A fortiori,* proof that defendant did not perform is insufficient to provide clear and convincing evidence that defendant did not intend to perform at the time the alleged agreement was made.

Without a showing by plaintiffs of the existence of all the elements essential to their fraud claim, summary judgment must be granted to GGvA. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at ——, 106 S.Ct. at 2513, 91 L.Ed.2d at 215.

*5. Constructive Fraud*

 Plaintiffs' fifth claim for relief alleges that "[b]ecause of the existence of a fiduciary or confidential relationship between plaintiffs and GGv[A]," GGvA's conduct constitutes constructive fraud. Amended Complaint ¶ 37. The elements of constructive fraud are the same as those set forth above for actual fraud except that instead of showing that GGvA knew that the representation was false, plaintiffs must prove the existence of a fiduciary or confidential relationship. *Brown v. Lockwood,* 76 A.D.2d at 733, 432 N.Y.S.2d 186.

This claim, like the claim for actual fraud, fails because of the insufficient showing of an essential element—detrimental reliance. In addition, I have already determined that the existence of a fiduciary relationship cannot be shown, and since there are no facts in the record to support a finding of a confidential relationship, this claim lacks an additional essential element.

## CONCLUSION

After the completion of discovery, plaintiffs are unable to make a showing sufficient to establish the existence of all ele-

ments essential to each of their claims against GGvA. Therefore, GGvA's motion for summary judgment is granted.

SO ORDERED.