**KIDZ CLOZ, INC., and Harold Schwartz, Plaintiffs,**

v.

**OFFICIALLY FOR KIDS, INC., Ruben Moreno, TC Funding Corporation, and Trends Clothing Corporation, Defendants.**

No. 00 Civ. 6270(DC).

United States District Court, S.D. New York.

June 9, 2004.

Bressler, Amery, & Ross by Bernard Bressler, Diana C. Manning, New York, NY, for Plaintiffs.

William C. House, P.C. by William C. House, New York, NY, for Defendants Officially for Kids, Inc. and Ruben Moreno.

Kluger, Peretz, Kaplan Berlin, P.L., by Abbey L. Kaplan, Michael B. Chesal, Miami, FL and Brown, Raysman, Millstein, Felder & Steiner, LLP by Edward Copeland, New York, NY, for Defendants TC Funding and Trends.

### MEMORANDUM DECISION

CHIN, District Judge.

This diversity action arises out of the failed relationship between two businesses in the children's clothing industry. In their second amended complaint, plaintiffs Kidz Cloz, Inc. ("Kidz Cloz") and Harold Schwartz ("Schwartz") assert four claims against defendants Officially for Kids, Inc. ("OFK"), Ruben Moreno ("Moreno"), TC Funding Corporation ("TC Funding"), and Trends Clothing Corporation ("Trends"): (1) breach of fiduciary duty, (2) unjust enrichment, (3) quantum meruit, and (4) wrongful termination of a partnership or joint venture. (Second Am. Compl. at 10–12). Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted and summary judgment shall be entered in favor of defendants on all claims.

### BACKGROUND

#### A. The Facts

In 1975, Schwartz formed a corporation, Barradine Industries ("Barradine"), which operated for approximately eleven years as a manufacturer's sales representative. (Deposition of Harold Schwartz ("Schwartz Dep.") at 21–22). Between 1975 and 1986, the majority of Schwartz's business was carried out for one clothing manufacturer, Hammer Knitwear ("Hammer"). (Id. at 27).

As Hammer's sales representative, Schwartz, through Barradine, was paid a sales commission. (Id. at 26, 29). While Schwartz was serving as a sales representative for Hammer, a company owned by Carolo Moreno, Moreno's father, was serving as one of Hammer's sewing contractors. (Second Am. Compl. at ¶ 13; Ruben Moreno Aff. ("Moreno Aff.") at ¶ 2). Hammer went out of business in 1986. (Schwartz Dep. at 29).

Schwartz subsequently approached Carolo Moreno and suggested to him that they form a company to manufacture children's clothes to be sold by Schwartz. (Schwartz

Dep. at 58–62). Carolo Moreno responded that "he wasn't particularly interested in going into manufacturing, but his son Ruben might be interested and [Schwartz] should talk to him." (*Id.*). Schwartz thereafter met with Moreno on one or two occasions to discuss "joining forces in creating a relationship where [Schwartz] would sell and market the product [and Moreno] would manufacture the product to sell to the retail trade." (*Id.* at 62–63). Schwartz initially suggested that he be a shareholder in Moreno's company, but Moreno was not interested in such an arrangement. (*Id.* at 471).

### 1. *The Alleged Partnership/Joint Venture*

Ultimately a business relationship was formed where, for thirteen years, Moreno's company, OFK, manufactured children's clothing products and Schwartz's companies, first Barradine and then Kidz Cloz, marketed and sold the products to the trade. (*Id.* at 63, 82, 276–77). The parties never reduced to writing whatever agreement they had with respect to their business relationship. (*Id.* at 63, 276–77).

Throughout the course of the relationship, Schwartz received payment from OFK in the form of sales commissions, with the commission amounts varying depending upon the profitability of the sales. (*Id.* at 109). Such payments to Schwartz were reflected on OFK's financial statements as commissions. (Deposition of Lawrence Kabat ("Kabat Dep.") at 11–12, 17–20). On occasion, Schwartz's commissions were reduced or eliminated due to customer discounts or special advertising charges. (Second Am. Compl. at ¶ 19).

Schwartz maintained a New York showroom for Kidz Cloz that he alleges was also OFK's New York office. (Schwartz Dep. at 92–93). Schwartz also carried a business card that identified him as vice president of OFK, and the parties represented to the industry that Schwartz was a partner in OFK. (*Id.* at 274, 331–32).

One customer to whom Schwartz successfully marketed and sold OFK's products was Wal–Mart, who eventually became the parties' largest client. (Affidavit of Diana C. Manning ("Manning Aff."), Ex. B).

### 2. *Moreno's Termination of the Alleged Partnership/Joint Venture*

In mid–1999, one of OFK's contractors introduced Moreno to Ginger Puglia and Mario Pollan, two individuals who had been involved with the sales and marketing end of the children's clothing business for several years, and who also had an ongoing relationship with Wal–Mart. (Affidavit of Ruben E. Moreno ("Moreno Aff.") at ¶ 21). Puglia and Pollen were interested in leaving their then-current positions and expressed an interest in becoming shareholders in OFK in exchange for handling all of the company's sales and merchandising. (*Id.* at ¶¶ 23–28).

Moreno thereafter terminated his business relationship with Schwartz, and Puglia and Pollan became shareholders in OFK and assumed responsibility for all of OFK's sales and merchandising. (*Id.* at ¶ 30). Schwartz and Kidz Cloz were paid all sales commissions earned through the date of termination. (Schwartz Dep. at 141).

### 3. *OFK's Financial Difficulties*

OFK began having financial difficulties in late 2000 when Wal–Mart returned a $1.2 million order due to defective merchandise. (Moreno Aff. at ¶ 32; Kabat Dep. at 27–32). A few months later, Wal–Mart issued a chargeback penalty against OFK for approximately $800,000 due to late deliveries. (Moreno Aff. at ¶ 32; Ka-

bat Dep. at 27–32). As a result of the Wal–Mart chargeback, OFK went into default with its secured creditor and principal lender. (Moreno Aff. at ¶ 37; Kabat Dep. at 37–43).

Thereafter, both OFK's accountant and bankruptcy counsel determined that OFK was insolvent and could no longer operate. (Kabat Dep. at 37–43, 65; Deposition of Peter Russin ("Russin Dep.") at 8–16). Consequently, to avoid having to abandon its business and creditors or file for bankruptcy, OFK entered into an agreement with TC Funding, a company formed by the president of Trends, Tom Cabrerizo. (Moreno Aff. at ¶¶ 43–44; Kabat Dep. at 57–61; Russin Dep. at 18–19). Pursuant to the agreement, in return for funding the production of the goods necessary to fill OFK's outstanding purchase orders, TC Funding obtained OFK's furniture, equipment, inventory, and the proceeds of the accounts receivable generated from the outstanding purchase orders. (Moreno Aff. at ¶¶ 43–44; Kabat Dep. at 57–61; Russin Dep. at 18–19, 49).

## B. *Prior Proceedings*

Plaintiffs commenced this action against OFK and Moreno on August 22, 2000. Plaintiffs filed an amended complaint on November 15, 2000. On November 27, 2000, OFK and Moreno moved to dismiss the complaint. The Court denied the motion on February 8, 2001. *See Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 00 Civ. 6270, 2001 WL 114318 (S.D.N.Y. Feb. 08, 2001), *amended and superseded by Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 00 Civ. 6270, 2002 WL 392291 (S.D.N.Y. Mar.13, 2002).

Thereafter, on January 31, 2002, plaintiffs filed a second amended complaint, adding TC Funding and Trends as defendants. TC Funding and Trends moved to dismiss the second amended complaint on May 6, 2002. The Court denied the motion on July 16, 2002. *See Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 00 Civ. 6270, 2002 WL 1586877 (S.D.N.Y. July 17, 2002).

## C. *The Instant Motion*

On October 1, 2003, defendants filed the instant joint motion for summary judgment. TC Funding and Trends argue that (1) plaintiffs have failed to demonstrate the existence of a partnership or joint venture between Schwartz and Moreno and their respective companies, (2) even if plaintiffs could establish that such a partnership or joint venture existed, summary judgment is proper because the alleged agreement was oral and, consequently, the relationship was terminable at will, and (3) even if plaintiffs were to prevail on their underlying claims against Moreno and OFK, summary judgment should be entered in favor of Trends and TC Funding because there is no successor liability. (Trends and TC Funding Mem. at 3, 14, 16).

OFK and Moreno (1) join in TC Funding's and Trends's arguments as to the absence of a partnership or joint venture and the consequences of the alleged oral agreement, and (2) argue, *inter alia*, that OFK could not have been a partner to any agreement with Schwartz and Barradine because OFK was not yet formed when the alleged agreement was made. (OFK and Moreno Mem. at 2; OFK and Moreno Reply Mem. at 2, 8).

For the reasons set forth below, defendants' motion for summary judgment is granted as to all claims.

## DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* 477 U.S. at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991). A factual issue is genuine if it can reasonably be resolved in favor of either party. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248, 106 S.Ct. 2505.

The party seeking summary judgment must demonstrate the absence of genuine issues of material fact, and then the nonmoving party must set forth facts proving that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party "must present concrete particulars and cannot succeed with purely conclusory allegations." *Fitch v. R.J. Reynolds Tobacco Co.*, 675 F.Supp. 133, 136 (S.D.N.Y.1987) (citation omitted). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249–

50, 106 S.Ct. 2505. As the Court held in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). The party resisting summary judgment must provide the Court with some basis to believe that his "version of relevant events is not fanciful." *Christian Dior–New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 38 (2d Cir.1986).

## B. *Wrongful Termination of a Partnership or Joint Venture Claim*

All parties rely upon New York law in their briefs. Moreover, as plaintiffs maintained a New York showroom that allegedly served as the New York office for plaintiffs and defendants, New York is connected to this action. (*See* Second Am. Compl. at ¶ 16). Consequently, the Court will apply New York law to the instant claims. *See Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) ("where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry"); *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984) ("in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied").

### 1. *Applicable Law*

Before addressing plaintiffs' claim for wrongful termination of a partnership or joint venture, I must first determine whether a genuine issue of fact exists as to whether a valid partnership or joint venture between the parties was created. As set forth in detail below, I conclude that no such issue of fact exists, for a reasonable jury could only find that no valid partnership or joint venture existed.

### a. *Existence of a Partnership or Joint Venture*

■ The concepts of "partnership" and "joint venture" are closely intertwined. Indeed, under New York law, "the legal consequences of a joint venture are equivalent to those of a partnership." *Itel Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990) (quoting *Gramercy Equities v. Dumont*, 72 N.Y.2d 560, 565, 534 N.Y.S.2d 908, 531 N.E.2d 629 (1988)); *see also Scholastic, Inc. v. Harris,* 259 F.3d 73, 84 (2d Cir.2001) ("Under New York law joint ventures are governed by the same legal rules as partnerships because a joint venture is essentially a partnership for a limited purpose." (citations omitted)); *Zeising v. Kelly,* 152 F.Supp.2d 335, 347 (S.D.N.Y.2001) ("[p]rinciples of partnership law control the analysis of joint venture agreements"). The elements required to prove the existence of each enterprise are also similar.

■ To demonstrate the existence of a partnership, a plaintiff must prove four elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners. *See North Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, 99 Civ. 4643, 2000 WL 1290608, *1, 2000 U.S. Dist. LEXIS 13139, at *3 (S.D.N.Y Sept. 11, 2000).

■ Likewise, a plaintiff pleading the existence of a joint venture must establish that: (1) two or more parties entered an agreement to create an enterprise for profit, (2) the agreement evidences the parties' mutual intent to be joint venturers, (3) each party contributed property, financing, skill, knowledge, or effort to the venture, (4) each party had some degree of joint management control over the venture, and (5) there was a provision for the sharing of both losses and profits. *See Itel Containers,* 909 F.2d at 701; *Price v. Gast,* 98 Civ. 7769, 2000 WL 369381, *12, 2000 U.S. Dist. LEXIS 4552, at *35–36 (S.D.N.Y. Apr. 11, 2000); *Shore Parkway Assocs. v. United Artists Theater Circuit, Inc.,* 92 Civ. 8252, 1993 WL 361646, *2, 1993 U.S. Dist. LEXIS 12663, at *5–6 (S.D.N.Y. Aug. 31, 1993). The absence of any one element "is fatal to the establishment of a joint venture." *Zeising,* 152 F.Supp.2d at 347–48. Further, "[a] joint venture represents more than a simple contractual relationship. Thus, it is insufficient for a [p]laintiff to allege mere joint ownership, a community of interest, or a joint interest in profitability." *Id.* at 347 (citations omitted).

■ In formulating an agreement to be joint venturers, "the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract." *Precision Testing Laboratories v. Kenyon Corp.,* 644 F.Supp. 1327, 1349 (S.D.N.Y.1986). Indeed, with respect to a determination as to the parties' intent, "[t]he ultimate inquiry ... is whether the parties have so joined their property, interests, skills, and risks [that] their contributions have become one and their commingled properties and interests have been made subject to each of the others' actions, on the trust and inducement that each would act for their joint benefit." *Zeising,* 152 F.Supp.2d at 348 (citations omitted).

■ The requirement that the parties have agreed to share in the profits and losses is "an indispensable essential of a contract of partnership or joint venture." *Steinbeck v. Gerosa,* 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958). "If there was no agreement as to the manner in which the parties were to share in the profits and the losses, the agreement did

not create a joint venture" or a partnership. *Zeising*, 152 F.Supp.2d at 348–49 (citations omitted); *Kosower v. Gutowitz*, 00 Civ. 9011, 2001 WL 1488440, *6, 2001 U.S. Dist. LEXIS, at *16–17 (S.D.N.Y. Nov. 21, 2001) ("It is axiomatic that the essential elements of a partnership must include an agreement between the principals to share losses as well as profits." (internal quotations and citations omitted)). Additionally, "the value of services is not sufficient to satisfy the required sharing of losses element." *Artco, Inc. v. Kiddie, Inc.*, 88 Civ. 5734, 1993 WL 962596, *11, 1993 U.S. Dist. LEXIS 21227, at *32 (S.D.N.Y. Dec. 28, 1993).

### b. *Statute of Frauds*

■ An oral agreement that does not specify a definite term of duration is not barred by the Statute of Frauds so long as the agreement can be performed in one year. *See Prince v. O'Brien*, 234 A.D.2d 12, 650 N.Y.S.2d 157, 158 (1st Dep't 1996). Such an agreement, however, is terminable at will. *See id.* ("An oral agreement to form a partnership for an indefinite period creates a partnership at will and is not barred by the Statute of Frauds."); *Scholastic, Inc.*, 259 F.3d at 86 ("Absent any definite term of duration, the joint venture is arguably one at will."); *Alnwick v. European Micro Holdings, Inc.*, 281 F.Supp.2d 629, 644 (E.D.N.Y.2003) ("Where ... there is no definite term of duration for the joint venture, it may be terminated at will."); *Hooker Chem. & Plastics Corp. v. Int'l Minerals & Chem. Corp.*, 90 A.D.2d 991, 456 N.Y.S.2d 587, 589 (4th Dep't 1982) (where a joint venture or "partnership is not limited as to time and there is nothing to show the intention of the parties as to its duration," it is an at will agreement (internal quotations and citation omitted)).

■ Furthermore, "New York law is clear that a venture at will can be terminated without liability for breach of contract by any partner at any time by any act which evidences intent to terminate the association." *Artco*, 1993 WL 962596, *8 n. 6, 1993 U.S. Dist. LEXIS 21227, at *22 n. 6 (citing N.Y. Partnership Law § 62(1)(b)); *see also Ebker v. Tan Jay Intern. Ltd.*, 741 F.Supp. 448, 469 (S.D.N.Y.1990) ("As a partner at will, [defendant] had the right to terminate the joint venture, and his termination of the partnership was not legally actionable."); *Shandell v. Katz*, 95 A.D.2d 742, 464 N.Y.S.2d 177, 179 (1st Dep't 1983) (partnership at will may be dissolved, without liability for breach of contract, on a "moment's notice").

### 2. *Application*

### a. *Existence of a Partnership or Joint Venture*

Plaintiffs contend that they have put forth "competent and compelling evidence to support their claims of partnership or joint venture which preclude the entry of summary judgment." (Pl. Br. at 6). I disagree.

### i. *Intent Element*

■ Plaintiffs have failed to present evidence from which a reasonable jury could find that the parties intended to form a partnership or joint venture. First, it is clear from Schwartz's own deposition testimony that, from the beginning, Moreno had no desire to become involved with Schwartz on a partnership level:

Q: ... When you first approached [Moreno], it was your idea to have a company together?

A: Yes.

Q: Both being owners?

A: Yes.

Q: Both being shareholders?

A: Yes.

Q: Your responsibility within that one corporation would be for sales and merchandising, correct?

A: Yes.

Q: His responsibility within that corporation would be the manufacturing side and the operations—

A. Yes.

Q: —correct?

A: Yes.

Q: *Now, he rejected that?*

A: *Yes.*

Q: Instead, you claim you formed a partnership where each of you are owners, correct?

A: Yes.

Q: And you had the responsibility for sales and merchandising?

A: Yes.

Q: He has responsibility for manufacturing and operations, correct?

A: Yes.

Q: And you each own it separately, you each own a piece of that business?

A: Yes.

Q: Is there any difference in your mind between that which [Moreno] rejected and that which [Moreno] accepted?

. . . . .

A: I don't know.

Q: What do you mean you don't know?

A: I don't know.

. . . . .

Q: ... [I]n your mind, do you think that there is any difference between that which he rejected and that which he accepted?

A: I don't know.

(Schwartz Dep. at 471–75) (emphasis added).

Second, Schwartz had experience with formal partnerships and, consequently, must have understood the importance of written agreements. At approximately the same time Schwartz alleges he formed a partnership with Moreno, he also entered into a partnership with an individual named Norman Goldberg. (*Id.* at 36). Unlike his relationship with Moreno, however, Schwartz and Goldberg operated pursuant to a written partnership agreement. (*Id.* at 38). If Schwartz had actually entered into such an agreement with Moreno, he would have undoubtedly reduced the agreement to writing as well.

Third, with respect to plaintiffs' argument that the parties conducted themselves as partners, a review of Schwartz's deposition testimony demonstrates that a reasonable jury could only find that Schwartz's (1) holding himself out to the industry as a partner in OFK and (2) carrying a business card which designated him as vice president of OFK were cosmetic business moves, not evidence of an actual partnership or joint venture:

Q: It was part of your discussion with [Moreno] about this issue, that there were buyers out there who didn't want to deal directly with sales reps but only wanted to deal directly with owners?

A: More specifically, Wal–Mart.

Q: You specifically discussed Wal–Mart with [Moreno] in 1986 when you proposed to him that you go in to business?

A: Yes.

Q: What did you say to [Moreno] about Wal–Mart?

A: In regards to? I'm sorry.

Q: How did it come up in the discussion?

A: Just that Wal–Mart has been showing in the industry that they would rather work with the owners of the business and not sales reps.

Q: That's what you told [Moreno] then?

A: To that—something to that order.

.　　.　　.　　.　　.

Q: Did you believe at the time you were having discussions with [Moreno], that this was a trend that was going to continue in the industry?

A: Yes.

.　　.　　.　　.　　.

Q: Now, in part, the reason that you wanted to hold yourself out to big retailers as a principal of OFK was in order for them to deal with OFK, because it would seem as if there was no sales rep, correct?

A: Correct.

Q: That's why you had a card printed up that said vice president?

A: Well, because I felt I was a vice president. Yes.

Q: And also, because if you were to approach a large retailer like Wal–Mart, they would believe that they were dealing directly with the manufacturer and wouldn't have the expense of a sales rep involved?

A: Yes.

.　　.　　.　　.　　.

Q: ... Do you really believe as being in the industry for as many years as you are, that Wal–Mart really believed that they were saving money because they were dealing with you as a principal as compared to a sales rep?

A: I think that they thought that they could save money by negotiating better prices by not paying commissions, that was my impression.

Q: *Why did you not just become a stockholder of OFK?*

A: *I would have liked to.*

Q: *Did you ask?*

A: *Yes.*

Q: *And it was rejected?*

A: *Yes.*

(Schwartz Dep. at 306, 468–71) (emphasis added).

Thus, while "[f]or over 13 years[ ] the parties represented that [ ] Schwartz was a partner in the business" (Pls.' Mem. at 10), "calling an organization a partnership does not make it one." *Kosower,* 2001 WL 1488440, *6, 2001 U.S. Dist. LEXIS, at *16–17 (complaint dismissed where plaintiff alleged that defendant referred to plaintiff as a partner and others referred to their arrangement as a partnership) (quoting *Brodsky v. Stadlen,* 138 A.D.2d 662, 526 N.Y.S.2d 478, 480 (App.Div.1988) (internal quotations omitted)).

Plaintiffs have not put forth sufficient evidence to raise an issue of fact as to their contention that Schwartz and Moreno intended to enter into a partnership or joint venture. Based upon the above-quoted excerpts of Schwartz's own deposition testimony and Schwartz's prior partnership experience, no reasonable juror could conclude that Moreno intended to enter into a fiduciary relationship with Schwartz, or even that Schwartz believed Moreno intended to enter into such a relationship. *See North Am. Knitting Mills, Inc.,* 2000 WL 1290608, *2, 2000 U.S. Dist. LEXIS 13139, at *5 ("Many companies seek to cooperate with each other and reach agreements to implement such cooperation. However, most of these agreements do not create [partnerships]." (internal quotations and citation omitted)).

### ii. *Agreement to Share Profits and Losses Element*

██ Plaintiffs have also failed to demonstrate that a reasonable jury could find that the parties had an agreement to share profits and losses. Schwartz contends that his share of the profits consisted of the commissions paid to him by OFK. (Schwartz Dep. at 100). Schwartz's sales commissions were determined on an order-by-order basis and based on a percentage of the invoice amount. (*Id.* at 98, 109).

Even assuming that (1) these commissions were profits and (2) Schwartz has put forth sufficient evidence demonstrating an agreement with Moreno to share these profits, this element is still not met because Schwartz has not demonstrated that the parties agreed with to share losses. *See Scott v. Rosenthal,* 97 Civ. 2143, 2000 WL 1863542, \*3, 2000 U.S. Dist. LEXIS 18275, at \*9 (S.D.N.Y. Dec. 20, 2000) ("an individual 'who has no proprietary interest in a business except to share profits as compensation for services is not a partner or a joint venturer' ") (quoting *Impastato v. De Girolamo,* 117 Misc.2d 786, 459 N.Y.S.2d 512, 514–15 (N.Y.Sup.Ct.1983), *aff'd,* 95 A.D.2d 845, 464 N.Y.S.2d 382 (2d Dep't 1983)). In fact, the parties never discussed what would occur in the event of a loss:

Q: In the event OFK operated at a loss in any particular year, would Barradine or Kidz Cloz be entitled to a commission under the agreement reached with Ruben?

A: If the company had a loss—number one, that's an assumption because I thought the company made money every year.

Q: I just want to know what your agreement was. Did you discuss with [Moreno] whether or not ... Kidz Cloz or Barradine would get paid?

A: *No, we never discussed that.*

Q: Okay. What was your intent as to what would happen?

A: Well, I never thought of the company as having a loss.

Q: Okay, sitting here today, reflecting back on what the deal was, what would have happened in the event OFK operated at a loss?

. . . . .

A: I couldn't answer a hypothetical question. I mean, what would have happened? *I don't know what would have happened.*

(Schwartz Dep. at 98–99) (emphasis added).

Thus, as the parties had never even discussed losses, certainly they did not have an agreement to share losses. *See Precision Testing Labs.,* 644 F.Supp. at 1349 (noting that "the parties never otherwise discussed the question of sharing profits and losses," the court determined that "this essential element of a joint venture agreement was not present"); *see also Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van Amerongen, Ltd.,* 675 F.Supp. 122, 127 (S.D.N.Y.1987) ("Since the requisite element of joint control and joint management was never addressed by the alleged co-venturers, it cannot reasonably be satisfied."). Hence, this "indispensable essential of a contract of partnership or joint venture" is missing, as a matter of law. *Steinbeck,* 4 N.Y.2d at 317, 175 N.Y.S.2d 1, 151 N.E.2d 170.

As the record lacks sufficient evidence to support plaintiffs' contention that Schwartz and Moreno entered into a valid partnership or joint venture agreement, plaintiffs' claim for wrongful termination of a partnership or joint venture must fail. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

#### b. *Statute of Frauds*

Even assuming, *arguendo,* that a valid oral agreement to enter into a partnership or joint venture relationship did exist between the parties, any such partnership or joint venture was at will and, consequently, could have been terminated by either party at any time without legal consequence.

The alleged agreement was, at best, a joint venture between two separate companies that agreed to work together for their mutual benefit, namely, to better market themselves to the trade. Additionally,

each company had separate assets. The alleged joint venture had no joint assets.

Plaintiffs' argument that the relationship was not terminable at will because it had a definite duration is unavailing. (Pls.' Mem. at 13). Specifically, an agreement to be partners or joint venturers "for the life of the parties or for so long as the [venture] was profitable" does not constitute a definite duration. (Pls.' Mem. at 13). Accordingly, the relationship was terminable at will, as a matter of law. *See, e.g., Sacco v. Iselin,* 84 Civ. 877, 1986 WL 14908, *1, 1986 U.S. Dist. LEXIS 16362, at *3–4 (S.D.N.Y. Dec. 19, 1986) (where the alleged oral agreement did not provide a termination date for the partnership, the agreement "was for a partnership at will, terminable within a year by either partner" and, consequently, "outside the Statute of Frauds"). Hence, plaintiffs are without legal recourse for the termination. *See, e.g., Ebker,* 741 F.Supp. 448, 469 (S.D.N.Y.1990) (where joint venture was terminable at will, the venture was effectively dissolved when defendant announced to plaintiff that she was "fired" because, "as a partner at will, defendant had the right to terminate the joint venture, and his termination of the partnership was not legally actionable").

In sum, plaintiffs have not presented any evidence to allow a reasonable juror to conclude that a joint venture or partnership between Schwartz and Moreno existed. Even assuming, *arguendo,* that a valid joint venture or partnership existed, a reasonable juror could only find that the relationship was terminable at will without legal consequence. Consequently, plaintiffs' claim for wrongful termination of a partnership or joint venture is dismissed.

## C. *Plaintiffs' Remaining Claims*

### 1. *Breach of Fiduciary Duty*

Plaintiffs' breach of fiduciary duty claim alleges that defendants breach-

ed their fiduciary duty to Schwartz "by taking for themselves the business and future opportunities Schwartz had as a partner or joint venturer." (Second Am. Compl. at ¶ 42). Because plaintiffs failed to establish the existence of a partnership or joint venture, this claim also fails. *See North Am. Knitting Mills,* 2000 WL 1290608, *4, 2000 U.S. Dist. LEXIS 13139, at *11 (plaintiff's breach of fiduciary duty claim fails where no partnership relationship existed); *Orderline Wholesale Distribs., Inc.,* 675 F.Supp. at 128 ("Since ... plaintiffs fail to make a showing sufficient to establish the existence of an enforceable joint venture or partnership agreement ... they also fail to make a showing sufficient to establish the existence of a fiduciary obligation to them by [defendant]—an element essential to their [breach of fiduciary duty claim]."); *Artco, Inc.,* 1993 WL 962596, *16, 1993 U.S. Dist. LEXIS 21227, at *48 ("Because ... [plaintiff] cannot establish as a matter of law the existence of an enforceable joint venture agreement ..., [defendant] owed it no fiduciary obligations.").

Even assuming that plaintiffs had established a fiduciary relationship, the claim still fails because, upon dissolution of a partnership at will, a partner's only remedy is an accounting. *See Ebker,* 741 F.Supp. at 468 ("the sole remedy available to [plaintiff] as a partner at will is an accounting"). Here, where (1) the alleged partnership was a joint venture between two businesses with no joint assets of its own, (2) no consideration was paid for goodwill, and (3) Schwartz was paid all commissions to which he was due, there are no assets to account for and, therefore, no available relief. *See Kaplan v. Joseph Schacter & Co.,* 261 A.D.2d 440, 690 N.Y.S.2d 91, 92 (2d Dep't 1999) ("Insofar as no consideration was paid for goodwill on the admission of partners, no amounts

had been paid or given on account of goodwill, and the firm's financial statements did not reflect any goodwill, it is clear that the partners did not otherwise view goodwill as a firm asset. Accordingly, the court properly determined that goodwill was not a distributable asset of the firm."); *Saltzstein v. Payne, Wood & Littlejohn*, 292 A.D.2d 585, 740 N.Y.S.2d 95, 96 (2d Dep't 2002) (granting motion for summary judgment dismissing plaintiff's cause of action for share of value of defendant's goodwill where "[t]he partnership agreement at issue did not specify that good will was a firm asset, no consideration was paid for good will when new partners joined, no amounts were paid or given on account of good will, and the firm's financial statements did not reflect any good will").

### 2. *Unjust Enrichment*

 Plaintiffs' claim for unjust enrichment also fails. "To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Astor Holdings, Inc. v. Roski*, 01 Civ.1905, 2002 WL 72936, *17, 2002 U.S. Dist. LEXIS 758, at *54 (S.D.N.Y. Jan. 17, 2002) (citing *Louros v. Cyr*, 175 F.Supp.2d 497 (S.D.N.Y.2001)).

Plaintiffs allege that defendants have been unjustly enriched by (1) keeping clients plaintiffs obtained for OFK, including Wal–Mart, and (2) wrongfully terminating plaintiffs and failing to compensate for "any good will and value added to defendants' business." (Second Am. Compl. at ¶¶ 46, 48).

First, because the alleged relationship was at will, defendants did not wrongfully terminate it. Second, plaintiff was fully compensated for the services it performed for OFK. Specifically, Schwartz and Kidz Cloz were paid all sales commissions earned through termination date. (Schwartz Dep. at 141).

Schwartz's companies were hired to market and sell manufacturing companies' products. In other words, Schwartz's companies were hired to obtain customers for the manufacturing companies Schwartz represented. Indeed, Schwartz's compensation scheme was tied directly to accomplishing that goal. Moreover, as the parties' agreement was at will, if Schwartz was unhappy with the terms, he was free to terminate the relationship or renegotiate his commission percentage at any time. These hardly constitute circumstances such that equity and good conscience require defendants to make restitution. Indeed, no reasonable juror could conclude that defendants were unjustly enriched. Thus, plaintiffs' unjust enrichment claim is without merit.

### 3. *Quantum Meruit*

 Plaintiffs' quantum meruit claim is based upon plaintiffs' expectation of "receiving the continuing benefits of [the] relationship." (Second Am. Compl. at ¶ 54). As discussed above, the parties' relationship was terminable at will, at best. Consequently, any such expectation was unjustified. Plaintiffs' quantum meruit claim, therefore, is also without merit.

Lastly, as plaintiffs' underlying claims are without merit, I need not address plaintiffs' claim with respect to successor liability. In sum, no reasonable juror could find for the plaintiffs with respect to any of the claims set forth in the second amended complaint. Accordingly, summary judgment is granted in favor of the defendants with respect to all claims.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is

granted. The second amended complaint is dismissed with prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.